**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Co-Lead Counsel for Plaintiffs and the Class

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMY CHAN, STEVEN WADE, SHUNFENG CHENG, and ELBURN IRISH, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | No.: 2:16-cv-09279-KSH-CLW |
| Plaintiffs, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| v. | **JURY TRIAL DEMANDED** |
| NEW ORIENTAL EDUCATION & TECHNOLOGY GROUP INC., and CHENGGANG ZHOU, | |
| Defendants. | |

Plaintiffs Amy Chan, Steven Wade, Shunfeng Cheng, and Elburn Irish ("Plaintiffs"),

individually and on behalf of all other persons similarly situated, by their undersigned attorneys,

for their Complaint against Defendants New Oriental Education & Technology Group Inc. ("New

Oriental", or the "Company"), and Chenggang Zhou, allege the following based upon personal

knowledge as to themselves and their own acts, and upon information and belief as to all other

matters. This Complaint is based upon the investigation conducted by and through Plaintiffs'

attorneys and included, among other things, a review of Securities and Exchange Commission

("SEC") filings by New Oriental Education & Technology Group Inc. ("New Oriental" or the

"Company"), English and Chinese media and analyst reports about the New Oriental, and former New Oriental employees. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired New Oriental American Depositary Shares ("ADSs") from September 28, 2016 through December 1, 2016, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      New Oriental offers diversified educational services in the People's Republic of China ("China"). New Oriental's offerings have historically focused on providing access to overseas opportunities to Chinese citizens, such as through English language courses and foreign (*i.e.*, non-Chinese) standardized test preparation.

3.      Since around 2008, New Oriental has also assisted students in applying to foreign universities – *i.e.*, admissions "counseling" – through New Oriental's subsidiary Beijing New Oriental Vision Overseas Consulting Co., Ltd. ("EDU Overseas"). EDU Overseas has no other business.

4.      EDU Overseas' business is, by some measures, the best of New Oriental's businesses. It accounts for almost 10% of New Oriental's revenues. Its operating margins are almost double New Oriental's overall operating margins. And unlike New Oriental's other high-margin line of business – foreign test preparation – EDU Overseas is a rapidly growing business.

5.      Defendant Chenggang Zhou, who has been New Oriental's CEO since September 2016, is largely responsible for EDU Overseas' success. New Oriental made him CEO of EDU

Overseas in 2008, when it was earning only a few million dollars a year in revenues. After seven years with Zhou at the helm, EDU Overseas' annual revenues were more than 100 million dollars.

6.      In its SEC filings, New Oriental claims that EDU Overseas' business is to **consult** with Chinese citizens to **assist** them in applying to foreign schools. EDU Overseas is a member of the American International Recruitment Council ("AIRC"), a U.S. Standards Development Organization recognized by the Department of Justice. The AIRC mandates that its members discourage customers from hiring professionals to ghost-write application materials.

7.      EDU also claimed that it had made strenuous efforts to materially comply with domestic (Chinese) regulations, and specifically highlighted certain measures enacted by Beijing, which  prohibit agencies from fabricating application materials to educational institutions.

8.      But the company Zhou made from nothing provides its customers with more than just advice. After the student steps in for a quick initial consultation and fills out a questionnaire – neither of which is mandatory, nor always obtained – EDU Overseas' "consultants" take over and ghost-write the entire application. They ghost-write the student's personal statement, taking care to invent stories about the student if the stories the student provided were insufficiently interesting.  They ghost-write reference letters for the student's professors to sign.  When an application calls for the student to submit a previously-written academic essay, EDU Overseas consultants will ghost-write that, too.  Most students, about 70%, never even comment on "their" personal statements or writing sample.

9.      Other EDU Overseas employees act as the unacknowledged intermediary between the student and the universities to which the student is applying. EDU Overseas creates fake email accounts that employees use to correspond with the universities to which the student is applying. When corresponding with these universities, EDU Overseas employees pretend to be the student.

EDU Overseas also creates fake application accounts which it uses to apply for the student to ensure that the student has **no** contact with the institutions he or she is applying to.

10.     These are not the isolated acts of a few bad apples.  They are the very heart of EDU Overseas' business model.  Many former employees, from various EDU Overseas offices, confirmed as much.  In addition, Plaintiffs obtained an executed form contract between EDU Overseas and one of its customers that includes an itemized price to ghost-write a personal statement.  That same contract provides EDU Overseas the right to open the student's correspondence, including emails, with the universities.  The contract candidly admits that EDU Overseas is providing "intermediary services."  Indeed, EDU Overseas had annual employees of the year awards, one of which was awarded *based on the quality of ghostwriting*.

11.     On December 2, 2016, *Reuters* published an article revealing, among other things, that EDU Overseas routinely ghost-wrote personal statements and application essays for its customers.[1]  The *Reuters* journalists also obtained an EDU Overseas contract, which contained similar provisions to that obtained by Plaintiffs here.  *Reuters* also reported that the AIRC was investigating EDU Overseas' misconduct.

12.     The *Reuters* revelations shocked the market causing the price of New Oriental's ADSs to fall over 14% from its previous close, damaging investors.

13.     Analysts employed by Nomura, SWS Research, Credit Suisse, Deutsche Bank, HSBC, Jefferies, JP Morgan, Macquarie, and Barclays all issued special reports on December 5, 2016 commenting on the *Reuters* article and its potential ramifications.  The Barclays analyst observed that the article had "resulted in damages to EDU's branding and reputation" and may result in EDU Overseas "no longer provid[ing] overseas consultancy services."  The JP Morgan

---

[1] The *Reuters* article is attached as Exhibit 1 to this filing and incorporated by reference.

analyst observed that "[w]e prefer TAL Education [a competitor] for less exposure to counselling services," and noted that "the reputational impact on EDU is difficult to determine especially if any findings prove to be a systemic fault of the company."  The Jefferies analyst observed that "the overall hit to New Oriental's brand name and any potential penalties may carry a much larger impact should the AIRC investigation find New Oriental to have engaged in systematic academic fraud."

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

16.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as a substantial part of the conduct complained of herein and subsequent damage occurred in this District.

17.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

18.     Plaintiffs Amy Chan, Steven Wade, and Shunfeng Cheng, as set forth in their PSLRA Certifications previously filed and incorporated by reference, acquired New Oriental ADSs at artificially-inflated prices during the Class Period and were damaged thereby.

19.     As set forth in his attached PSLRA Certification, which is attached as an Exhibit and incorporated by reference, Plaintiff Elburn Irish acquired New Oriental ADSs at artificially-inflated prices during the Class Period and was damaged thereby.

20.     Defendant New Oriental is a Cayman Islands corporation headquartered in Beijing, People's Republic of China ("China").  New Oriental provides private educational services under the New Oriental brand in China.  New Oriental ADSs trade on the New York Stock Exchange ("NYSE") under the ticker symbol "EDU."

21.     Defendant Zhou has served as a director of the Company since March 2007, as President between January 2016 and September 2016, and has served as CEO since September 2016.  From 1998 to 2000, Zhou served as a Correspondent for the Asia Pacific Region and a Program Host at BBC.  He holds a Master's degree in Communications from Macquarie University in Australia.

22.     Collectively, New Oriental and Zhou are herein referred to as "Defendants."

23.     New Oriental is liable for the acts of Zhou and its employees under the doctrine of *respondeat superior* and common law principles of agency, as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

24.     The scienter of Zhou and other employees and agents of the Company is similarly imputed to New Oriental under *respondeat superior* and agency principles.

## FORMER EMPLOYEES

25.     Former Employee 1 ("FE 1") was a Document Specialist[2] in EDU Overseas' Beijing office between October 2015 and January 2016.  FE 1 worked on applications to U.S. colleges.

26.     Former Employee 2 ("FE 2") was an Early-Stage Consultant in EDU Overseas' Guangzhou office between July 2016 and January 2017.  FE 2 worked on applications to U.S. colleges.

27.     Former Employee 3 ("FE 3") was an Early-Stage Consultant in EDU Overseas' Kunming office between April 2016 and November 2016.  FE 3 worked on applications to U.S. colleges.

28.     Former Employee 4 ("FE 4") was a Document Specialist in EDU Overseas' Zhengzhou office between April 2015 and July 2015.  FE 4 worked on applications to U.S. colleges.

29.     Former Employee 5 ("FE 5") was a Marketing Specialist at EDU Overseas' Zhengzhou office between December 2012 and July 2014.

30.     Former Employee 6 ("FE 6") was a Document Specialist at EDU Overseas' Zhengzhou office between February 2011 and August 2013.

31.     Former Employee 7 ("FE 7") was a Senior Advisor in the U.S. Department in EDU Overseas' Beijing office between July 2013 and March 2015.

32.     Former Employee 8 ("FE 8") was a Marketing Manager in the U.S. Department in New Oriental's Zhengzhou office between July 2008 and January 2012. FE 8 had professional

---

[2] The responsibilities of Document Specialists and Early-Stage Consultants are set out in ¶¶61-82, below.

contacts with Chenggang Zhou. FE 8 was responsible for EDU Overseas publicity campaigns and recruitment of personnel, including Document Specialists.

33.     Former Employee 9 ("FE 9") was an Early-Stage Consultant from December 2014 to July 2016 in EDU Overseas' Qingdao office.

34.     Former Employee 10 ("FE 10") was a Document Specialist from September 2012 to May 2015 in EDU Overseas' Wuhan office.

35.     Former Employee 11 ("FE 11") was a Document Specialist from July 2011 through February 2015 in EDU Overseas' Shanxi office.

## **BACKGROUND**

36.     New Oriental is the largest provider of private educational services in China based on number of program offerings, total student enrollments, and geographic presence.  It offers a range of educational programs, services, and products, including English and foreign language training, test preparation courses for admissions, and assessment tests.

37.     New Oriental also purportedly engaged in admissions consulting for international study, conducted through its subsidiary, EDU Overseas.  New Oriental described its role in this business as simply assisting students in their applications to international schools.

### *International students*

38.     The value of an education at an American university is acknowledged throughout the world.  Obtaining a degree from a U.S. school opens doors both for international graduates who return to their home countries, and for those who remain in the U.S.  An American education is particularly valued in China.

39.     Since the middle of the 2000's, China's increasing prosperity has meant that more and more Chinese families are willing and able to pay for a U.S. education.

40.     Enrollment of Chinese students in the U.S. has, accordingly, soared:



*Year represents end of academic year.*

Source: Te-Ping Chen and Miriam Jordan, Why So Many Chinese Students Come to the U.S., *The Wall Street Journal*, May 1, 2016

41.     And the U.S. is only one of the destinations for Chinese students.  The total number of students leaving China to study abroad likewise increased from 144,000 in 2008, to 523,700 in 2015.

42.     At the same time, the demographics of Chinese students studying abroad has changed.  According to the New York Times, while in the mid 2000's only 20% of Chinese students in the U.S. were undergraduate students, by the middle of the 2010's, about half were.

43.     But these relatively inexperienced students from wealthy families have created opportunities not just for themselves, but also for businesses that cater to their needs.

44.     New Oriental has historically dominated the market for Chinese students seeking to prepare to take foreign admissions tests like the SAT.

45.     In 2008, Zhou was the head of EDU Vision.  He saw an opportunity to expand New Oriental's historical business line by cross-selling a more expensive service to these wealthier students.

46.     This new service was billed to the outside world and investors as "admissions counseling."  In truth, though, and as more fully set out below, the students had little responsibility for "their" application.  EDU Overseas' "consultants" ghost-wrote any personal statements and personal essays, and often even ghost-wrote academic essays that served as the student's writing sample.  The "consultants" ghost-wrote professors' letters of recommendations. The "consultants" also created fake email addresses and application accounts for the students, which they used to correspond with admissions staff and complete applications as if they were the students – ***and to which they denied the students access***.

### *Admissions counselor regulatory associations prohibit ghost-writing*

47.     As noted above, the AIRC is the leading Standards Development Organization regulating international student recruitment.  It is recognized by the DOJ and the Federal Trade Commission and has 268 institutional members.

48.     EDU Overseas became a member of the AIRC in 2012.

49.     The AIRC requires organizations seeking membership to demonstrate, and existing members to maintain, adherence to a code of conduct.  The AIRC's code of conduct has notchanged since 2012.

50.     This code of conduct includes provisions requiring that "the [admissions consulting] agency conducts itself in a transparent manner in which only truthful claims are made, and both institutions and students are served in an unbiased manner."  AIRC Code, 2.6.

51.     The code of conduct further mandates that "the agency does not knowingly provide false or misleading records of student academic achievement [and] ensures that essays and/or statement of purpose are originally created by the student to whom they are attributed."  *Id.*, 4.1.5.

52.     Similarly, the National Association for College Admission Counseling ("NACAC") is an organization of nearly 16,000 professionals in the postsecondary admissions field.  The NACAC has promulgated a Statement of Principles and Good Practice, which provides, in relevant part, that "[a]ll counseling members should [] encourage students to be the sole authors of their applications and essays and counsel against inappropriate assistance on the part of others."

53.     Accordingly, both the NACAC and AIRC prohibited ghost-writing applications.

***EDU Overseas was a large and high-margin portion of New Oriental's business***

54.     Zhou became EDU Overseas' President (its overall head) in May 2008, and would continue in this position until September 2016, when he became New Oriental's CEO.

55.     When Zhou first started as EDU Overseas' CEO, it had few or no operations. Indeed, its total 2008 revenues were approximately RMB 28 million, or a few million dollars.

56.     But EDU Overseas expanded by a factor of more than 30 under Zhou's leadership. In the fiscal year ended May 31, 2015, EDU Overseas earned revenues of more than RMB 700 million, or more than a hundred million dollars.

57.     According to FE 8, through at least 2009, Zhou was heavily personally involved in EDU Overseas' day-to-day operations.  Indeed, according to FE 8, Zhou personally selected the managers for the 6 EDU Overseas offices that were established by 2009. Zhou also caused EDU

Overseas to adopt the strategies of already-existing unscrupulous admissions "consulting" firms such as Jinjilie Overseas Study, including specifically their ghost-writing practices.

58.     New Oriental was founded on the overseas test preparation business, and continues to tout attachment to the idea of placing Chinese students in foreign schools.  Indeed, on the call to discuss Q1 2016 earnings on October 10, 2015, New Oriental founder Michael Yu: (a) promised that he would personally attend to the overseas test preparation and consulting business; (b) expressed hope that the overseas test preparation and consulting businesses would grow substantially; and (c) stated that these businesses were part of New Oriental's essence.

59.     New Oriental did not as a matter of course inform investors of EDU Overseas' financial metrics independent of its overseas test preparation business but it occasionally provided specific financial metrics in response to questions.  For example, in the Q3 2016 earnings call taking place on April 19, 2016, New Oriental CFO Zhihui Yang stated that EDU Overseas contributed 8-9% to New Oriental's total revenues.  Moreover, Yang added that EDU Overseas' operating margins were about 20% – much higher than New Oriental's contemporaneous overall operating margins of 12%.  Because of its high margins, EDU Overseas accounted for between 13.1% (at 8% of revenue) and 14.8% (at 9% of revenue) of New Oriental's operating income that quarter.

60.     Moreover, unlike New Oriental's test preparation business, EDU Overseas was growing rapidly.  For example, on April 20, 2016, following the Q3 2016 Earnings Call, a Credit Suisse analyst published a report noting that EDU Overseas' revenues had grown by 25% against Q3 2015, and predicting that it would grow again by 25% in FY 2017. New Oriental's overall revenues had increased only 20.6%, and were projected to increase only 16.1%, over the same periods.

## DEFENDANTS' MISCONDUCT

*New Oriental practices academic fraud*

61.     Unbeknownst to investors, however, applications fraud pervaded EDU Overseas' operations.

62.     EDU Overseas employs two types of application consultants, Early-Stage Consultants and Late-Stage Consultants.[3]  "Late-Stage Consultants," however, are referred to informally by a more accurate and descriptive title:  Document Specialists.

### *Early-Stage Consultants*

63.     According to former employees, EDU Overseas' clients' first contact with EDU Overseas was through Early-Stage Consultants.  Early-Stage Consultants approach and sell to prospective clients, primarily through the Internet and cross-selling.  They serve as New Oriental's point of contact with the student.  For example, students were encouraged, but not required, to visit New Oriental; if they did so, they would speak with an Early-Stage Consultant.  Moreover, Early-Stage Consultants would also encourage – but again, not require – the student to fill out a basic questionnaire.

64.     Early-Stage Consultants also act as the student's point of contact with the universities to which the student is applying.  To do so, Early-Stage Consultants create an email address and related accounts on the university application systems for the student.  The student does not have access to the email address, and is not provided with the password to the email address or application accounts.  The Early-Stage Consultants then use this email address and application accounts, to which the student has no access, to correspond with, and apply to, the

---

[3] The Chinese-language title for Early-Stage Consultants is 前期顾问, while the formal Chinese-language title for Late-Stage Consultants is 后期顾问.

universities.  When corresponding with the universities, the Early-Stage Consultants do not disclose that they are the representatives of the students, and in fact, represent that they are the student him or herself.  Former Employees 1, 2, 3, 4, 5, 6, 8, 9, 10, and 11 report that the practices set out in this paragraph occurred throughout their tenures, which spanned from July 2008 to January 2017.

65.     According to FE 2, it was New Oriental's policy never to allow students to access their own email account or application file.  When FE 3 encountered students who sought to have access to their own email accounts or applications, FE 3 would simply reiterate the policy. Eventually, the students would all abandon their request.

66.     Moreover, the December 2, 2016 *Reuters* article reported that the authors had obtained a copy of an executed contract between EDU Overseas and one of its clients.  According to the *Reuters* journalists, the contract contained a clause providing that EDU Overseas would create an email address to which the student did not have access and would use it to correspond with the universities.  Plaintiffs independently obtained an executed contract between EDU Overseas and one of its clients (the "Application Contract") to apply to French universities.  The original Application Contract and a translation thereof (with student information redacted), which are attached as Exhibits 2a and 2b., and incorporated by reference, included an article providing that:

> **Article 14.** [EDU Overseas] agrees and confirms that [EDU Overseas] has the right to open and process any letters (including but not limited to postal mail, email, or fax) sent to the applicant by universities to which the applicant has applied or not.

67.     Notably, the Application Contract Plaintiffs obtained is plainly a standardized contract.  It included a price list, and instructs the customer to place a mark next to the product the applicant seeks.  And according to FE 9, who provided the Application Contract, the Application Contract for U.S. schools is substantially identical, except for price and university differences.

14

68.     The Application Contract further provides that EDU Overseas' responsibility was to "apply for universities in the designated country on behalf of the applicant," and candidly refers to the services EDU Overseas provides as "intermediary services."  That is, EDU Overseas, and not the student, would apply to the schools.

69.     Creating emails and application accounts to which the student does not have access also helps EDU Overseas cover up its mistakes or negligence.  According to FE 6 and 10, during application seasons, busy Early-Stage Consultants would falsely tell students their applications had been submitted or correspondence had been sent to the schools.  Because the students had no access to their own applications, they had no way to tell that the Early-Stage Consultants were lying.

### Document Specialists

70.     Document Specialists are principally charged with ghost-writing applications.  All of the Former Employees confirmed that this includes students' personal statements and personal essays, and any other material purporting to have been drafted by the student.  According to FE 1, Document Specialists also ghost-wrote recommendation letters for the students' teachers' or professors' signature. FE 1 and 2, both Document Specialist, reported that they spent the majority of their time ghost-writing documents.  Indeed, the Application Contract includes a "document production" charge for drafting "one personal resume, one statement of motivation" and certain visa application documents.  Moreover, the Application Contract's Article 12 also provides that EDU Overseas maintains the right to make public and use the documents it "assisted the student in drafting."[4]

---

[4] FE 7 noted that EDU Overseas commonly used expressions like "assisted students to compose" documents in contracts as euphemisms for ghost-writing.

71.     According to FE 7, the essential nature of the Document Specialists' job was ghost-writing, and ghost-writing was an essential part of the services EDU Overseas provided. Moreover, the source stated that terms indicating plagiarism such as "preparing documents required for application" were used in recruitment notices and the Document Specialists' job descriptions.  And according to FE 8, certain of EDU Overseas' Chinese-language newspaper advertisements and other promotional materials sometimes emphasized the "quality of writing" or the "importance of supporting documents" – both code words boasting of the quality of Document Specialists' ghost-writing.  According to FE 9, EDU Overseas' contracts always include a price list with application document preparation clearly listed as one of the services provided.

72.     The Application Contract also allows customers to select desired admissions, which EDU Overseas will then obtain.  For example, should an applicant desire admission into a top 5 business school in France, he or she should select Contract France-A-1 and Document A-1, which costs RMB 25,000 (approximately $3,500) with ghost-written documents included.  Should EDU Overseas fail to secure admission, all but RMB 3,000 will be refunded.  Ex 2, at 3.

73.     Certain schools require applicants to submit a previously-completed academic essay as a writing sample.  According to FE 3, students were given a choice to either submit a previously-completed essay to the Document Specialist, which the Document Specialist would then heavily edit for submission, or to simply have the Document Specialist ghost-write a writing sample for the student. Source 3 added that, either way, students rarely had any comments.  FE 5 and 6 both confirmed that Document Specialists almost always drafted academic essays for students.

74.     Moreover, Document Specialists were evaluated predominantly on their ability to write in English.  According to FE 4, to evaluate Document Specialists', managers frequently

reviewed and evaluated the Document Specialists' ghost-written essays.  And, according to FE 6, Document Specialists had to pass internal tests to prove their ghost-writing ability.  Similarly, according to FE 8, EDU Overseas held training sessions to improve the Document Specialists' writing, and there were internal employee contests that aimed to identify, recognize, and reward the best Document Specialists.  According to FE 11, EDU Overseas' headquarters flew new Document Specialists to training sessions to teach them writing skills.

75.     Defendants were well aware that the Document Specialists were committing fraud. In fact, according to FE 1 and 4, the Document Specialists were instructed to personalize the application documents in order not to be discovered as ghost written. And, according to FE 11, EDU Overseas used firm-wide anti-plagiarism software similar to Turnitin[5] on ghost-written documents to ensure that the submissions *would not* be identified as having been ghost-written by universities.

76.     According to FE 1, Document Specialists would base their ghost-written documents on the questionnaire or notes from the student's meeting with the Early-Stage Consultant.  According to FE 3, whenever the student's own experience as reported in the questionnaire was not sufficiently interesting, the Document Specialist would simply invent an anecdote illustrating a quality the student purported to have.

77.     New Oriental employs numerous Document Specialists.  According to FE 4, his office alone employed 10 English-language Document Specialists.  FE 8 reported that EDU Overseas employs about the same number of Document Specialists as Early-Stage Specialists. According to FE 9 and FE 10, Early-Stage Consultant and Document Specialists were EDU

---

[5] Turnitin is software used by academic institutions to catch plagiarism.

Overseas' sole profit center.  In fact, the only other employees in FE 9's office were managers and support staff.

78.     Indeed, according to FE 10, New Oriental even provided ghost writing services for PhD applications.  In such cases, Document Specialists also drafted introductory letters to professors purporting to be from the student.

79.     According to FE 1 and 4, only the top students provided any comments to the ghost-written application materials.  The remaining students provided no comments or any original contribution to the essays they purportedly wrote. Asked to estimate the proportion of such "top students" who provided comments, FE 4 estimated that they accounted for only 30% of New Oriental's students.  Indeed, according to FE 4, not only are most students not able to match the writing quality displayed in their personal statements or essays, most do not have the language skills even to question the writing.

80.     The FE were in agreement that it was impossible for management not to be aware of these facts.  According to FE 4, it is "difficult to imagine" management was not aware of the practice of ghost-writing, as it is a "vital part" of the services New Oriental promised to provide. Indeed, FE 4 continued that ghost-writing is one of the most important factors attracting students to New Oriental. According to FE 3, it is quite impossible for management not to have known of the ghost writing. FE 6 scoffed at the idea that management might not have known of the ghost-writing; "of course management knew."

81.     According to FE 7, during Zhou's seven-year tenure at EDU Overseas, there never was an attempt made to "curb[] the ghost-writing."

82.     Former Employees 8, 9 and 11, noted that the fact that the service EDU Overseas offered was ghostwriting was not concealed within EDU Overseas.  In fact, according to FE 11,

EDU Overseas gave out firm-wide awards recognizing top employee performers in various categories. The award for best Document Specialists, titled "Golden Document Specialist,"[6] was based on the quality of the recipient's ghost-writing. Honorees received, among other things, a certificate from EDU Overseas' headquarters, which was headed by Zhou. Firm-wide emails were sent out celebrating the award. New Oriental also held firm-wide team events for honorees.

***Defendants' False and Misleading Class Period Statements***

83.     On September 2, 2016, Zhou was promoted to CEO of New Oriental.

84.     On September 27, 2016, New Oriental filed its annual report on Form 20-F for the fiscal year ended May 31, 2016 (the "2016 20-F") with the SEC. Zhou was the sole signatory to the 2016 20-F. Zhou also separately certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that:

> 1. I have reviewed this annual report on Form 20-F of New Oriental Education & Technology Group Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

85.     The 2016 20-F misstated EDU Overseas' role and function. First, the 2016 20-F repeatedly and invariably referred to EDU Overseas as New Oriental's "overseas studies consulting business." Second, the 2016 20-F repeatedly and invariably represented that the income EDU Overseas generated was "consulting" income.

86.     In fact, the services provided by EDU Overseas were not "consulting" services. EDU Overseas' sole interaction with most of its clients were to meet the client, briefly, and have

---

[6] In Chinese characters, 金牌文书.

the client fill out a questionnaire.  The substantial services EDU Overseas provided were to draft and submit the client's application, principally through ghost-writing the various documents the client was required to submit.

87.    The 2016 20-F misstated EDU Overseas' operations:

*Overseas Studies Consulting*.  Our consultants **help students through** the application and admission process for overseas educational institutions and provide useful college, graduate and career counseling advice to help students make informed decisions.  We also counsel students with the immigration process for overseas studies, such as obtaining visas and housing. We charge each student a fee based on the scope of consulting services requested by the student.

*            *            *

We also provide **consulting services** to students regarding overseas studies and related processes, such as visa applications.  We charge each student a fee based on the scope of **consulting services** requested by the student and recognize revenues when our **consulting services** are delivered.  **We expect that revenues from these consulting services will continue to increase in the future.**

(Emphasis added)

88.    The above statement was false because EDU Overseas did not "help students through" the application.  Instead, for the reasons set out in ¶86, above, EDU Overseas' drafted the students' application, typically without the student's assistance.

89.    Moreover, these statements assumed additional importance because, as further set out in the above statements, New Oriental assured investors that revenues from consulting would increase.

90.    The 2016 20-F provided that:

**We are required to obtain various operating licenses and permits and to make registrations and filings for our business operations in China; failure to comply with these requirements may materially adversely affect our business and results of operations.**

We are required to obtain and maintain various licenses and permits and fulfill registration and filing requirements in order to conduct and operate our business. For instance, to establish and operate a school to provide language training and test

preparation services, we are required to obtain a private school operating permit and to make necessary filings for each learning center with the local counterparts of the Ministry of Education and the Ministry of Civil Affairs. Our business is also subject to various health, safety and other regulations that affect various aspects of our business in the cities in which we operate and we must obtain various licenses and permits under these regulations for our operations. ***We have been making efforts to ensure compliance with applicable rules and regulations in all material respects.***

(Second emphasis added)

91.     The 2016 20-F set out an example of such regulation:

**Regulation**

This section summarizes the principal [Chinese] regulations relating to our business.

*          *          *

[T]he Education Commission of Beijing and Beijing Administration for Industry and Commerce jointly issued the Beijing Measures of Supervisions and Recognition of Intermediate Services for Self-Funded Overseas Studies (Trial) on September 30, 2015, which require that any intermediate service organization engaged in such services in Beijing shall satisfy certain requirements set up therein. . . . The intermediate service organizations ***which satisfy such requirements*** may apply with the Education Commission of for [sic] the Recognition on the Intermediate Service Organization for Self-funded Overseas Studies.

*          *          *

[EDU Overseas], a subsidiary of New Oriental China engaging in overseas studies consulting and other consulting services, has obtained the relevant licenses from the MOE and the Beijing Municipal Public Security Bureau.

92.     Thus, Defendants' statements provided that only organizations satisfying the Beijing Measures of Supervisions and Recognition of Intermediate Services for Self-Funded Overseas Studies (Trial) (the "Beijing Measures") may apply for a license.  The implication was that because EDU Overseas applied for and obtained a license, EDU Overseas complied with the Beijing Measures, among others.

93.     But Article 13 of the Beijing Measures provides, in relevant part, that the agency "shall not fabricate and provide fake materials to the person that the agency provides services to,

or direct, assist or cause the person that the agency provides services to provide fake materials or to fabricate pertinent materials to go overseas for self-funded studies."  Rather, as provided in Article 12, the agency "may . . . guid[e] admission application into certain foreign schools, provide authentic and truthful documents and materials."

94.     Thus, at no time did EDU Overseas comply with the Beijing Measures. Nor, contrary to its statement that it had "been making efforts to ensure [material] compliance" with all rules and regulations, did EDU Overseas make any attempt to comply with the Beijing Measures. Instead, EDU Overseas' business model was based on flouting the Beijing Measures by completing students' applications for them by ghost-writing relevant documents and managing all communications with the universities.  Accordingly, the statement that New Oriental had made efforts to ensure compliance with applicable Chinese regulations, including the Beijing Measures, was false.

95.     During the entirety of the Class Period, New Oriental's English-language website described EDU Overseas' business as international "consulting":

**Int'l Study Consulting**

Today, an increasing number of Chinese students are considering opportunities to study abroad.  From consulting services to full-time intensive study, New Oriental offers a full suite of services to help students achieve – and get the most out of – their dream of international study.

New Oriental's experienced overseas studies consultants ***work closely with students throughout the entire process of preparing to go abroad: from school selection and application***, to scholarship applications, to the visa and immigration process, to practical assistance such as locating student and off-campus housing. In addition, we offer a range of training programs to make sure students are best prepared to get the most out of their overseas experiences.

(Emphasis added)

96.     In fact, EDU Overseas counselors do not "work closely" with students.  Instead, for the reasons set out in ¶86, above, EDU Overseas' drafted the students' application, typically without the student's assistance.

97.     During the entirety of the Class Period, EDU Overseas' English-language website described EDU Overseas' benefits to Partners (i.e., universities to which students applied) as:

> Direct access to prospective students
> Since most New Oriental students start with our language training programs, we are able to track their record and performance history. [EDU Overseas'] partners can have access to these student profiles to help with recruitment and program.

98.     In fact, EDU Overseas actively misled its partners about students' language abilities by ghost-writing personal statements, writing samples, and other writings attributed to the student.

***Loss causation***

99.     On December 2, 2016, *Reuters* published a report alleging academic applications fraud at New Oriental.

100.    Specifically, based on conversations with eight former and current EDU Overseas employees and review of a contract between EDU Overseas and one of its clients, *Reuters* reported that:

a.      "Most [New Oriental] clients lacked the language skills to write their own essays or personal statements, so counselors wrote them; only the top students did original work."  This is confirmed by FE 3.

b.      "A New Oriental student contract reviewed by *Reuters* states that its services include 'writing or polishing' parts of college applications."  The Application Contract included a charge for drafting documents.

c.      "The contract says New Oriental will set up an email account on behalf of the client for communicating with colleges, keeping sole control of the password."  The Application Contract provides that EDU Overseas would apply on behalf of the student, and would "open and process"

any and all communications addressed to the student.  Moreover, Former Employees 1, 2, 3, 4, 5, 6, 8, 9, 10, and 11 all reported that EDU Overseas would create email and applications accounts and would not provide the student with logon information.

d.      According to *Reuters*, former EDU Overseas employee Olivia Qiu "wrote essays for students.  Other employees, she said, wrote personal statements, supplemental essays and recommendation letters. 'Sometimes, the student didn't even see [the application] before they submitted it' to colleges."  All Former Employees reported that EDU Overseas ghost-wrote essays, personal statements, and recommendation letters.

e.      Former EDU Overseas employee Alan Li "said he would use material for essays from questionnaires the students completed but would invent stories if necessary."  FE 3 reported that if the experiences reported in the students' questionnaire answers were not sufficiently interesting, Document Specialists would invent stories.

101.    Also on December 2, 2016, *Reuters* reported that the AIRC would investigate EDU Overseas in response to the *Reuters* report.

102.    On this news, the price of New Oriental's ADSs fell $6.99 per share, or over 14% from its previous closing price, to close at $42.00 per share on December 2, 2016, damaging investors.

103.    Zhou knew that the *Reuters* report's allegations were true, as they were part of company policies he had implemented in his seven year reign as EDU Overseas' CEO, but New Oriental still denied *Reuters*' allegation in both English and Chinese-language statements.

104.    On December 3, 2016, New Oriental falsely denied the claims of the *Reuters* report in a Chinese-language press release:

> [EDU Overseas] has always prohibited any falsification. We discovered that the descriptions of so-called falsified documents in the *Reuters* article were essentially

from former employees. We will not comment on the truthfulness of these employee statements. Vision Overseas has strict and definite stipulations in terms of operational procedures, employee training, and occupational conduct. The company has no tolerance for documentary fraud and takes falsified grades very seriously. This year, Vision Overseas has discovered two employees who conducted operations in violation of the rules, and turned them over to judicial authorities. ***Evidently, these actions were by individuals and cannot be equated to company actions.***

105.    On December 5, 2016, New Oriental falsely denied the claims of the *Reuters* report

in an English-language press release:

New Oriental prides itself on its longstanding commitment to education and the high standards it has for itself as well as the students it assists with its programs. All of the Company's business operations, including those carried out by [EDU Overseas], are governed by robust policies and the Company has designed procedures to guard against any unendorsed behavior by employees. The Company does not condone the kinds of behavior described in the media reports, and has in the past enforced disciplinary actions against those employees who breached the Company's policies and procedures.

106.    Then, on December 15, 2016, New Oriental CFO and the Company's IR Director

held a conference call with Brean Capital and a group of investors.  According to Brean's summary

of the call:

**Updates on academic fraud allegation.**   Company highlighted that EDU's business operations are governed by strict policies and stringent procedures with disciplined controls of its employee behavior.  While the investigation by American International Recruitment Council (AIRC) is pending, management currently expects a limited financial impact due to its limited exposure:  the overseas consulting business contributed 8% of EDU's total revenue with U.S. contributing 50% of the consulting business revenue, of which AIRC is a part of.

107.    Analysts were shocked by the *Reuters* article.  Analysts employed by Nomura,

SWS Research, Credit Suisse, Deutsche Bank, HSBC, Jefferies, JP Morgan, Macquarie, and

Barclays all issued special reports on or about December 5, 2016 commenting on the *Reuters*

article and its potential ramifications.

108.    Many of these analysts expressed great concern:

a. The Barclays analyst observed that the article had "resulted in damages to EDU's branding and reputation" and may result in EDU Overseas "no longer provid[ing] overseas consultancy services."

b. The JP Morgan analyst observed that "[w]e prefer TAL Education [a competitor] for less exposure to counselling services," and noted that "the reputational impact on EDU is difficult to determine especially if any findings prove to be a systemic fault of the company."

c. The Jefferies analyst observed that "the overall hit to New Oriental's brand name and any potential penalties may carry a much larger impact should the AIRC investigation find New Oriental to have engaged in systematic academic fraud."

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

109. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased or otherwise acquired New Oriental ADSs traded on the NYSE during the Class Period (the "Class"). Excluded from the Class are Defendants herein, current and former officers and directors of New Oriental, and members of their immediate families; any entity in which Defendants have or had a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

110. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, there were approximately 140 million New Oriental ADSs outstanding and actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class who are geographically dispersed. Record owners and other members of the Class may be identified from

records maintained by New Oriental or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

111.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

112.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

113.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts or omitted to state material information about the business, operations, and management of New Oriental;

c.    whether Defendants caused New Oriental to issue false and misleading financial statements during the Class Period;

d.    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.    whether the prices of New Oriental ADSs during the Class Period were artificially inflated because of Defendants' conduct complained of herein;

f.     whether Defendants acted with the requisite level of scienter;

g.     whether Zhou was a controlling person of the Company;

h.     whether reliance may be presumed; and

i.     whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, what is the proper measure of damages.

114.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

115.     Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

116.     In addition, Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory, because New Oriental's ADSs traded in an efficient market during the Class Period, as follows:

a.     Throughout the Class Period, New Oriental's ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market, throughout the Class Period.  ADSs were highly liquid during the Class Period, with an average daily volume of 980,063 ADSs;

b. As a regulated issuer, New Oriental filed periodic public reports with the SEC and the NYSE;

c. The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

d. The market reacted promptly to public information disseminated by the Company, as new, Company-specific information was rapidly reflected in the price of New Oriental's ADSs;

e. New Oriental's securities were covered by at least 21 securities analysts employed by major brokerage firms who wrote reports about the Company during the Class Period, including Bank of America Merrill Lynch, Credit Suisse (Hong Kong) Limited, Deutsche Bank, and Goldman Sachs & Co., and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

f. On average, 3.5% of New Oriental's ADSs were traded weekly, permitting a *very strong* presumption that its shares traded on an efficient market;

g. Seven specialist firms made a market in New Oriental's ADSs; and

h. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of New Oriental's ADSs.

117. Therefore, the market for New Oriental ADSs promptly digested current information regarding the Company from all publicly available sources and reflected such

information in New Oriental's share price.  Under these circumstances, all purchasers of New Oriental ADSs during the Class Period suffered similar injury through their purchase of the Company's ADSs at artificially inflated prices and a presumption of reliance applies.

## FIRST CAUSE OF ACTION

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

118.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

119.    This cause of action is asserted against all Defendants.

120.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period, did:  (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other Class members to purchase New Oriental's ADSs at artificially inflated and distorted prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

121.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of New Oriental as specified herein.

122.    Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of New Oriental's value, performance, and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary to make the

statements made about New Oriental and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of New Oriental ADSs during the Class Period.

123.    Each of the Defendants' primary liability, and controlling person liability, arises from the following:  (a) Zhou was a high-level executive, directors and/or agent at the Company during the Class Period and had control thereof; (b) by virtue of his responsibilities and activities as CEO of the Company, was privy to and participated in the creation, development, and reporting of the Company's plans, projections and/or reports; (c) Zhou enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports, and other data and information about the Company's, operations; and (d) Zhou was aware of the Company's dissemination of information to the investing public, which he knew or recklessly disregarded was materially false and misleading.

124.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing New Oriental's financial condition from the investing public and supporting the artificially inflated price of its ADSs.  As demonstrated by Defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

125. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for New Oriental's ADSs was artificially inflated during the Class Period.

126. In ignorance of the fact that market prices of New Oriental's publicly-traded ADSs were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's ADSs trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired New Oriental's ADSs during the Class Period at artificially high prices and were damaged thereby.

127. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding New Oriental's financial results and condition, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired New Oriental ADSs, or, if they had acquired such ADSs during the Class Period, they would not have done so at the artificially inflated or distorted prices at which they did.

128. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

129. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's ADSs during the Class Period.

130.    This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of ADSs giving rise to the cause of action.

## SECOND CAUSE OF ACTION

### Violation of Section 20(a) of the Exchange Act
### Against Zhou

131.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

132.    This cause of action is asserted against Zhou.

133.    Zhou acted as a controlling person of New Oriental within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions, agency, and his ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's dissemination of information to the investing public, Zhou had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  Zhou was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

134.    In particular, Zhou had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Zhou, moreover, had ultimate authority over the Company's statements,

including controlling the content of such statements and whether and how to communicate such statements to the public.

135.    As set forth above, New Oriental and Zhou each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

136.    By virtue of his position as a controlling person, Zhou is liable pursuant to Section 20(a) of the Exchange Act as he culpably participated in the fraud alleged herein.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period.

137.    This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of ADSs giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiffs as class representatives and Plaintiffs' counsel as Class Counsel;

b.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  May 30, 2017                        Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
          /s/ Laurence M. Rosen
Laurence M. Rosen LR-5733
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
lrosen@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne (pro hac vice)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

**POMERANTZ LLP**
Jeremy A. Lieberman (not admitted)
Tamar A. Weinrib (pro hac vice)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: taweinrib@pomlaw.com

Co-Lead Counsel for Plaintiffs and Class

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of May, 2017, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


/s/ Laurence M. Rosen

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against New Oriental Education & Technology Group Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The New Oriental Education & Technology Group Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

| | |
|---|---|
| **First name:** | Elburn |
| **Middle initial:** | E |
| **Last name:** | Irish |
| **Address:** | REDACTED |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Country:** | |
| **Facsimile:** | |
| **Phone:** | |
| **Email:** | |

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 11/23/2016 | 200 | 50.75 |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 12/07/2016 | 200 | 44.06 |

**Certification for Elburn Irish (cont.)**

7. I have not served as a representative party on behalf of a class under the federal securities laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the
United States, that the information entered is accurate:          **YES**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 12/30/2016