NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMY CHAN, STEVEN WADE, SHUNFENG CHENG, and ELBURN IRISH, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>*Plaintiffs*,<br><br>v.<br><br>NEW ORIENTAL EDUCATION & TECHNOLOGY GROUP INC. and CHENGGUANG ZHOU,<br><br>*Defendants*. | Civ. No. 16-9279 (KSH) (CLW)<br><br><br><u>OPINION</u> |

### I.  <u>Introduction</u>

Defendant New Oriental Education & Technology Group Inc. ("New Oriental") has moved (D.E. 22) to dismiss the amended class action complaint filed by plaintiffs Amy Chan, Steven Wade, Shunfeng Cheng, and Elburn Irish ("plaintiffs") in this putative class action brought under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b); Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder; and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Defendant Chengguang Zhou ("Zhou"), New Oriental's chief executive officer, joins in the motion (D.E. 49), which is fully briefed and was argued to the Court.

### II.  <u>Background</u>

The amended complaint alleges as follows.  New Oriental is a China-based educational services company that has historically focused on affording "access to overseas opportunities to Chinese citizens," including through English language courses and preparation for foreign standardized tests.  (D.E. 21, Am. Compl. ¶ 2.)  It is purportedly the "largest provider of private

educational services in China based on number of program offerings, total student enrollments, and geographic presence" and "offers a range of educational programs, services, and products, including English and foreign language training, test preparation courses for admissions, and assessment tests." (*Id.* ¶ 36.) The company's ADSs[1] trade on the New York Stock Exchange. (*Id.* ¶ 20.) According to plaintiffs, "New Oriental has historically dominated the market for Chinese students seeking to prepare to take foreign admissions tests like the SAT." (*Id.* ¶ 44.)

Since 2008, the company has, through its subsidiary, Beijing New Oriental Vision Overseas Consulting Co., Ltd. ("EDU Overseas"), engaged in admissions counseling or consulting for students applying to foreign universities and in providing "assistance" to students with their applications. (*Id.* ¶¶ 3, 37.) EDU Overseas allegedly has no other business, and its activities account for about 10% of New Oriental's revenues. (*Id.* ¶¶ 3-4.) It is a member of the American International Recruitment Counsel ("AIRC"), which the amended complaint describes as a standards-development organization that regulates international student recruitment, including through a code of conduct. (*Id.* ¶¶ 6, 47-49.) AIRC requires that members "discourage customers from hiring professionals to ghost-write application materials," and its code of conduct requires the member agency to "'conduct[] itself in a transparent manner in which only truthful claims are made, and both institutions and students are served in an unbiased manner.'" (*Id.* ¶¶ 6, 50 (quoting AIRC Code, 2.6).) It further mandates that the member not "'knowingly provide false or misleading records of student academic achievement,'" and that it ensures essays and statements of purpose are "'originally created by the student to whom they are attributed.'" (*Id.* ¶ 51 (quoting AIRC Code, 4.1.5).)[2]

---

[1] American depository shares.
[2] According to the amended complaint, another organization in the field, the National Association for College Admission Counseling, has promulgated a "Statement of Principles and

Zhou was the president of EDU Overseas from 2008 to 2016, when he became CEO of New Oriental. (*Id.* ¶¶ 5, 21, 54.) In 2008, the first year of EDU Overseas, the total number of Chinese students studying abroad was 144,000; by 2015, that number had increased to 523,700. (*Id.* ¶ 41.) These numbers bear out what the amended complaint alleges, that during this time and while Zhou was in charge of EDU Overseas, he expanded EDU Overseas dramatically. (*Id.* ¶¶ 55-56.)

In securities filings, New Oriental has claimed that EDU Overseas' business is "to ***consult*** with Chinese citizens to ***assist*** them in applying to foreign schools." (*Id.* ¶ 6 (emphasis in original).) Plaintiffs aver, however, that EDU Overseas goes much further, and that it "provides its customers with more than just advice." (*Id.* ¶ 8.) After a student customer "steps in for a quick initial consultation and fills out a questionnaire – neither of which is mandatory, nor always obtained – EDU Overseas' 'consultants' take over and ghost-write the entire application." (*Id.* ¶ 8; *see also id.* ¶ 86 ("The substantial services EDU Overseas provided were to draft and submit the client's application, principally through ghost-writing the various documents the client was required to submit.").) This includes the student's personal statement, reference letters for the student's professors to sign, and essays. (*Id.* ¶ 8; *see also id.* ¶¶ 46, 70, 73.) Plaintiffs further allege that employees also act as an "unacknowledged intermediary" between students and the universities to which the students apply, creating email accounts used to correspond with the universities as the student and denying the student access to that email. (*Id.* ¶¶ 9, 46, 64-65.) Moreover, EDU Overseas allegedly creates application accounts to which

_____

Good Practice" providing that members should "'encourage students to be the sole authors of their applications and essays and counsel against inappropriate assistance on the part of others.'" (*Id.* ¶ 52.) The complaint leaves unclear whether New Oriental or EDU Overseas is a member of this organization or otherwise subject to its "principles."

the students have no access so the student has no contact with the institutions applied to. (*Id.* ¶¶ 9, 46, 64-65.)  The intake functions and correspondence with universities to which students apply are handled by "early-stage consultants," while the alleged ghostwriting is handled by employees called "late-stage consultants" or "document specialists."  (*Id.* ¶¶ 62-64, 70-71, 73, 76.)  EDU Overseas evaluated document specialists on their English-language writing ability, held trainings to improve their writing, and rewarded the best document specialists.  (*Id.* ¶¶ 10, 74, 82.)

These acts are allegedly "the very heart of EDU Overseas' business model."  (*Id.* ¶ 10.)  As support, the amended complaint points to a Reuters article that triggered this lawsuit (discussed in greater detail below) that cites various former employees and describes a contract that purportedly provided that EDU Overseas would "create an email address to which the student did not have access and would use it to correspond with the universities" and which contained a charge for drafting documents.  (*Id.* ¶¶ 66, 100.)  Plaintiffs also rely on a contract they obtained between EDU Overseas and one of its customers for application to French universities that permits EDU Overseas to open the student's correspondence with universities and describes the services as "intermediary services."  (*Id.* ¶ 66 & Ex. 2a-b.)[3,4]  According to a

---

[3] Exhibit 2a is a Chinese-language version of the contract.  Exhibit 2b is an English translation.
[4] The parties to the appended contract are the "esteemed applicant" and "New Oriental Vision Overseas Consulting Co. Ltd. (hereinafter 'Vision Overseas')," the predecessor title of EDU Overseas.  The precatory language to the various sections of the contract reads that the applicant and Vision Overseas have "negotiated to reach the following agreement for mutual compliance regarding the applicant's acceptance of intermediary services for privately funded overseas study provided by Vision Overseas."  (Am. Compl., Ex. 2b, at 2.)  The specific language about opening student correspondence reads:

> Article 14.  Vision Overseas agrees and confirms that Vision Overseas has the right to open and process any letters (including but not limited to postal mail, email, or fax) sent to the applicant by universities to which the applicant has applied or not.

(*Id.* at 3.)

former employee, the contract for applications to United States schools is "substantially identical, except for price and university differences." (*Id.* ¶ 67.)

The amended complaint also asserts that this "business model" was confirmed by a number of former EDU Overseas employees. Overall, the amended complaint cites 11 former employees who worked as document specialists, early-stage consultants, advisors, or in marketing at varying times between 2008 and 2017. (*Id.* ¶¶ 25-35.)

Plaintiffs characterize the alleged ghostwriting and other purported fraudulent activity of EDU Overseas as company-sanctioned by pointing to company-wide use of anti-plagiarism software and contend that document specialists had been "instructed" to personalize documents to avoid discovery of the alleged ghostwriting. (*Id.* ¶ 75.) They also cite former employees who speculate that it was "impossible" or "difficult to imagine" that management did not know. (*Id.* ¶ 80.)

The amended complaint alleges that the alleged true nature of EDU Overseas' business – and consequently the purported falsity of New Oriental's statements about the business to that point – was revealed in a December 2, 2016 Reuters article. (*See id.* ¶¶ 11, 66, 99-100.) The article reported widespread practices of Chinese education companies, including New Oriental, that purportedly constituted "college application fraud." (Am. Compl., Ex. 1, at 1.) According to the article, "[e]ight former and current New Oriental employees," only three of whom are identified in the article, told Reuters it "engaged in college application fraud, including writing application essays and teacher recommendations, and falsifying high school transcripts." (*Id.*) Three former New Oriental employees, David Shi, Olivia Qiu, and Alan Li, claimed that they were the ghost-writers of student essays and teacher recommendations that were sent to universities in support of student applications. Plaintiffs allege that the Reuters article alerted the

market and investors to the true nature of New Oriental's business, resulting in a drop in stock price that damaged investors.  (Am. Compl. ¶¶ 12, 102.)  Plaintiffs further contend that the Reuters article "shocked" and "concern[ed]" analysts, and that it triggered an investigation by AIRC into EDU Overseas.  (*Id.* ¶¶ 101, 107-08.)

The purported discrepancies between New Oriental's public statements and characterizations about EDU Overseas' business, including in a securities filing, and the picture painted by the former employees and the documents discussed above form the basis for plaintiffs' claims.  Specifically, plaintiffs assert that New Oriental's Form 20-F, filed with the SEC on September 27, 2016, for the fiscal year ended May 31, 2016, made several actionable misrepresentations.  They also contend that New Oriental's English-language website mischaracterized the nature of EDU Overseas' business.

The challenged portions of New Oriental's 2016 Form 20-F are as follows:

- It referred to EDU Overseas as New Oriental's "overseas studies consulting business" and stated that income generated by it was "consulting income."  (Am. Compl. ¶ 85.) Moreover, it characterized EDU Overseas' operations as "helping" and "consulting":

> *Overseas Studies Consulting.* Our consultants **help students through** the application and admission process for overseas educational institutions and provide useful college, graduate and career counseling advice to help students make informed decisions. We also counsel students with the immigration process for overseas studies, such as obtaining visas and housing.  We charge each student a fee based on the scope of consulting services requested by the student.
>
> \* \* \*
>
> We also provide **consulting services** to students regarding overseas studies and related processes, such as visa applications.  We charge each student a fee based on the scope of **consulting services** requested by the student and recognize revenues when our **consulting services** are delivered.  **We expect that revenues from these consulting services will continue to increase in the future**.

(*Id.* ¶ 87 (emphasis added in the amended complaint).)  Plaintiffs allege that these statements were false because EDU Overseas did not merely provide "consulting" services or "help" students apply; it actually prepared the application materials.  (*Id.* ¶¶ 86, 88.)

- It represented that the company had been making efforts to ensure compliance with applicable rules and regulations pertaining to its licensure, and implied that it complied with a specific Chinese regulation referred to as the "Beijing Measures."  First, the amended complaint alleges, the Form 20-F stated as follows:

> ***We are required to obtain various operating licenses and permits and to make registrations and filings for our business operations in China; failure to comply with these requirements may materially adversely affect our business and results of operations.***
>
> We are required to obtain and maintain various licenses and permits and fulfill registration and filing requirements in order to conduct and operate our business. For instance, to establish and operate a school to provide language training and test preparation services, we are required to obtain a private school operating permit and to make necessary filings for each learning center with the local counterparts of the Ministry of Education and the Ministry of Civil Affairs.  Our business is also subject to various health, safety and other regulations that affect various aspects of our business in the cities in which we operate and we must obtain various licenses and permits under these regulations for our operations. ***We have been making efforts to ensure compliance with applicable rules and regulations in all material respects.***

(*Id.* ¶ 90 (second emphasis added in amended complaint).)  Second, the Form 20-F summarized a Chinese regulation, the Beijing Measures of Supervisions and Recognition of Intermediate Services for Self-Funded Overseas Studies (Trial) (the "Beijing Measures"), as requiring intermediate service organizations to meet certain requirements, and stated that organizations meeting the requirements can apply with the education commission for "the Recognition on the Intermediate Service Organization for Self-funded Overseas Studies."  (*Id.* ¶ 91.)  By stating that EDU Overseas had "obtained the relevant licenses from the MOE and the Beijing Municipal Public Security Bureau," plaintiffs allege, the Form 20-F implied EDU Overseas complied with

the Beijing Measures. (*Id.* ¶¶ 91-92.) However, the Beijing Measures purportedly prohibit fabrication and providing "fake materials" to clients, and directing or assisting them in providing fake or fabricated materials for overseas study. (*Id.* ¶ 93.) Plaintiffs assert, consequently, that the foregoing explicit and implicit representations about attempts to comply and compliance with regulations, including the Beijing Measures, were false. (*See id.* ¶ 94.)

With respect to the New Oriental English-language website, plaintiffs take issue with statements that described EDU Overseas' business as "consulting" and that New Oriental's "experienced overseas studies consultants ***work closely with students throughout the entire process of preparing to go abroad: from school selection and application,*** to scholarship applications . . . ." (*Id.* ¶ 95 (emphasis in amended complaint).) Plaintiffs contend that EDU Overseas doesn't "work closely" with students; rather it simply drafts the applications for them. (*Id.* ¶ 96.) Similarly, the website described benefits to universities as including direct access to students and an ability to track students' record and performance history because many begin with New Oriental language programs. (*Id.* ¶ 97.) Plaintiffs contend that EDU Overseas was misleading universities about the students' language abilities by ghostwriting their materials. (*Id.*)

On December 3, 2016, New Oriental issued a Chinese-language press release denying the claims in the Reuters article, contending that EDU Overseas had always prohibited falsification and that the falsification claims in the article came "essentially from former employees." (*Id.* ¶ 104.) The press release refused to "comment on the truthfulness of these employee statements," and asserted that EDU Overseas "has strict and definite stipulations in terms of operational procedures, employee training, and occupational conduct," with no tolerance for

document fraud.  (*Id.*)  It went on to state that EDU Overseas had referred two employees who violated these rules to judicial authorities.  (*Id.*)[5]

Two days later, on December 5, 2016, New Oriental issued an English-language press release that also denied the assertions in the Reuters article, albeit in less definitive terms:

> New Oriental prides itself on its longstanding commitment to education and the high standards it has for itself as well as the students it assists with its programs. All of the Company's business operations, including those carried out by [EDU Overseas], are governed by robust policies and the Company has designed procedures to guard against any unendorsed behavior by employees.  The Company does not condone the kinds of behavior described in the media reports, and has in the past enforced disciplinary actions against those employees who breached the Company's policies and procedures.

(*Id.* ¶ 105.)

On a December 15, 2016 conference call with investors, New Oriental executives purportedly "highlighted that EDU's business operations are governed by strict policies and stringent procedures with disciplined controls of its employee behavior," and, although the AIRC investigation was pending, management expressed that it expected a limited financial impact. (*Id.* ¶ 106.)

Plaintiffs filed their original complaint on December 15, 2016 (D.E. 1), and the amended complaint on May 30, 2017 (D.E. 21).  The amended complaint was filed on behalf of a putative class consisting of "all persons or entities who purchased or otherwise acquired New Oriental ADSs traded on the NYSE during the Class Period," defined as September 28, 2016 through December 1, 2016, inclusive.  (Compl. ¶¶ 1, 109.)  New Oriental, joined later by Zhou, has moved to dismiss the amended complaint for failure to state a claim upon which relief may be granted, and for failure to meet the heightened pleading requirements of Fed. R. Civ. P. 9(b) and

---

[5] The excerpt in the complaint is in English, and is presumably a translation.

the Private Securities Litigation Reform Act ("PSLRA").  (D.E. 22, 49.)  Defendants argue that

the amended complaint fails to allege an actionable misstatement or omission; that it does not

adequately allege the existence of scienter; and that it fails to plead loss causation.  (D.E. 22-1,

Moving Br.; D.E. 28, Reply Br.)  Plaintiffs dispute that they failed to plausibly plead these

elements of their claims under Section 10(b) and Rule 10b-5.  (D.E. 26, Opp. Br.)

## III.   Legal Standard

### A. Standard of Review

The Federal Rules of Civil Procedure require a complaint to contain a "short and plain

statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In

assessing whether a complaint meets this standard, and whether it is therefore sufficient to

survive dismissal under Fed. R. Civ. P. 12(b)(6), the Court is required to "accept all well-pleaded

allegations as true and draw all reasonable inferences" in the plaintiff's favor.  *City of Cambridge

Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018).  The complaint must

make out a claim for relief that is "plausible," not merely speculative. *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A claim meets the

"plausibility" standard only if the factual allegations permit the Court to "'draw the reasonable

inference that the defendant is liable for the misconduct alleged.'" *Fowler v. UPMC Shadyside*,

578 F.3d 203, 210 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

Claims under Section 10(a) of the Exchange Act and Rule 10b-5 must also satisfy the

requirements of Fed. R. Civ. P. 9(b), which requires allegations of fraud to "'state with

particularity the circumstances constituting fraud or mistake,'" and the PSLRA, 15 U.S.C. § 78u-

4, which, as discussed below, imposes heightened particularity requirements on the material

misrepresentation and scienter elements of these claims.  *City of Cambridge Ret. Sys.*, 908 F.3d at 879.

In ruling on a Rule 12(b)(6) motion, the Court is confined to reviewing the pleadings, plus a limited universe of additional documents; it may consider documents "'integral to or explicitly relied upon in the complaint,'" as well as "'undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'"  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citations omitted); *see also Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004) (court may consider "the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim").

## B.  Claims under Sections 10(b) and 20(a) and Rule 10b-5

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation."  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010) (citation omitted).

In 1995, Congress passed the PSLRA.  Among Congress' objectives was to "curb perceived abuses of the § 10(b) private action."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 320 (2007) ("Private securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law.").   Along with substantive changes to private securities litigation, the PSLRA also imposed procedural changes, including heightened pleading requirements.  *Id.* at 321.  To meet them, the complaint must "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading,'" and, for any allegations

made upon information and belief, "'all facts on which that belief is formed.'" *City of Cambridge Ret. Sys.*, 908 F.3d at 879 (quoting 15 U.S.C. § 78u-4(b)(1)). The PSLRA requires a plaintiff to provide "'the who, what, when, where, and how: the first paragraph of any newspaper story.'" *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016) (citation omitted). To meet the scienter requirement, the complaint must also "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *City of Cambridge Ret. Sys.*, 908 F.3d at 879 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). Scienter in this context is defined as a "'knowing or reckless'" mental state "'embracing intent to deceive, manipulate, or defraud,'" and the facts giving rise to this state of mind must be pled with particularity. *OFI*, 834 F.3d at 490 (citation omitted). The inference of scienter must be "more than merely plausible or reasonable--it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Section 20(a) provides that persons who directly or indirectly control any person liable under the Exchange Act or rules promulgated under it are jointly and severally liable with the controlled person for violations of the act, unless the controlling person "acted in good faith and did not directly or indirectly induce the acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Liability is derivative of an underlying violation of Section 10(b) by the controlled person. *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013)). Accordingly, if no Section 10(b) violation has been adequately pleaded, the Section 20(a) claim also fails. *Id.*

## IV.    Discussion

### A.  Claim under Section 10(b) and Rule 10b-5

As discussed above, plaintiffs claim that New Oriental's representations in its 2016 Form 20-F concerning its "consulting" services and income and that it "helps" students, as well as its

statements and implications regarding regulatory compliance, were materially false. They also take issue with the descriptions of EDU Overseas' business on New Oriental's English-language website. Plaintiffs point to three sources as support for their claim that New Oriental intentionally and materially misrepresented the nature of its business: (1) the Reuters article published December 2, 2016, (2) a sample EDU Overseas contract for services, and (3) statements by anonymous former employees.

### 1. Reuters Article

According to Reuters, "New Oriental employees said most clients lacked the language skills to write their own essays or personal statements, so counselors wrote them." (Am. Compl., Ex. 1, at 1.) Only three New Oriental employees, David Shi, Olivia Qiu and Alan Li, are named and quoted in the article. Shi admits, "I wrote essays and recommendation letters for my students when I worked at New Oriental, which I still do right now for my own consultancy." (*Id.* at 2.) Qiu had used New Oriental when she applied to college, and she claims, "I didn't write anything. They wrote everything for me." (*Id.* at 4.) She later took a job at New Oriental, where she claims she ghost-wrote essays for students, but she ultimately quit over ethical concerns. (*Id.*) The article states that Li "said he wrote personal statements and edited recommendation letters students had written about themselves." (*Id.*) Li is only directly quoted as saying he felt "really conflicted" about his actions, but chose to do them because a good student who was a "horrible writer" should get a break. (*Id.*) Neither Shi, Qiu, nor Li alleges that New Oriental instructed them to ghost-write applications.

From the foregoing, plaintiffs claim the Reuters article revealed that EDU Overseas "routinely ghost-wrote personal statements and application essays for its customers." (Am. Compl. ¶ 11.) But on close examination, the contents of the Reuters article do not meet the

heightened particularity required of claims under Section 10(b) and Rule 10b-5. As to Shi, Qiu, and Li, "the who, what, when, where, and how" of how they came to learn of what they say happened is missing. The article is devoid of information about when specifically Shi and Qiu worked at New Oriental, for example. And as to Qiu's application, there are no specifics about who the "they" are who "wrote everything" and what the "everything" consisted of.

In its motion to dismiss, New Oriental noted the Reuters article "raises more questions than it answers: Did these employees work at New Oriental during the Class Period? Was this based on first-hand knowledge? How widespread was the practice? Where and when did it take place? Was the alleged ghostwriting known to or endorsed by management, and what is the basis for any such conclusion?" (Moving Br. 23.) This is not surprising; Reuters is not a securities fraud plaintiff, and while newspaper articles can certainly alert investors to wrongdoing, "the *complaint* must rise or fall on allegations about defendant['s] conduct and not on wide-eyed citation to the gratuitous commentary of outsiders." *Hershfang v. Citicorp*, 767 F. Supp. 1251, 1255 (S.D.N.Y. 1991) (emphasis added)).

The statements in the Reuters article also fail to support a conclusion that the scienter requirement is adequately pleaded. None of the former employees' claims in the article alleges that anyone in a management role at New Oriental endorsed or even knew of ghost-writing practices. The statements these former employees did make, even in conjunction with the other allegations and sources to which plaintiff points, are insufficient to give rise to any reasonable inference of scienter, much less one that is at least as compelling as the opposing inference.[6]

---

[6] In view of the amended complaint's failure to adequately plead material misrepresentations or scienter, the Court need not reach whether loss causation is sufficiently pleaded.

## 2. Sample Contract

Plaintiffs describe the contract attached to the amended complaint as "plainly a standardized contract. It included a price list, and instructs the customer to place a mark next to the product the applicant seeks." (Am. Compl. ¶ 67.) It "includes an itemized price to ghost-write a personal statement," "provides EDU Overseas the right to open the student's correspondence, including emails, with the universities," and, plaintiffs contend, "candidly admits that EDU Overseas is providing 'intermediary services.'" (*Id.* ¶ 10.) "That is, EDU Overseas, and not the student, would apply to schools." (*Id.* ¶ 68.) It also "includes a 'document production' charge for drafting 'one personal resume, one statement of motivation' and certain visa application documents." (*Id.* ¶ 70.)

Plaintiffs have manipulated lines from the contract to create the impression that it facially admits to ghost-writing. The contract itself refers to "the applicant's acceptance of **intermediary** services for privately funded overseas study"; provides permission to "make public and use the documents and other materials that [EDU Overseas] **guided** the applicant in writing"; and directs that "all mail **correspondence between the applicant and the university** shall utilize services of international large express delivery companies." (Am. Compl., Ex. 2b, at 2-4 (emphasis added).)

Thus, although plaintiffs rely on contract language as evidence that New Oriental has materially misstated the nature of its business, in its proper context, that contract language supplies no basis to meet the "material misrepresentation" element. While plaintiffs point to EDU Overseas' term "intermediary role" as support for their allegations, it seems an accurate description for facilitating contact between students and universities and assisting in the visa application process. Notably, plaintiffs allege the contract includes a "charge for drafting 'one

personal resume, one statement of motivation.'" (Am. Compl ¶ 70.)  But they added the word 'drafting' in the amended complaint to make it appear as if the contract states that 'drafting' is included in the cost.  Plaintiffs further argue the contract language that consultants are "assisting," is in reality a "euphemism[] for ghost-writing." (*Id.* ¶ 70 n.4.)  This is a jump the Court is unwilling to take on the basis of the constellation of facts as plaintiffs have pleaded them.  Nor does the right to open communications from the university mean EDU Overseas is the sole communicator with the university, especially because the contract also specifies how mail correspondence between the *applicant* and the university should be sent.  In spite of plaintiffs' urging, the Court does not find that the sample contract permits them to meet the "material misrepresentation" requirement.

### 3.  Confidential Witnesses

#### i.  Standard for Use of Confidential Witnesses

Confidential witnesses may provide the factual basis for a securities fraud claim, so long as the statements meet the heightened pleading standard.  *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004).  When plaintiffs' *documentary* evidence is insufficient, their "reliance on confidential sources to supply the requisite particularity for their fraud claims thus assumes a heightened importance." *Id.* at 148.  *See also Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 528 (D.N.J. 2010) (Wolfson, J.) (reliance on confidential witnesses is tantamount to pleading "on information and belief").

Section 78u–4(b)(1) of the PSLRA adds the requirement that the complaint "state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u–4(b)(1).  The Third Circuit has explained that this added hurdle, as applied to confidential witnesses, means the complaint "must also describe the sources of information with particularity, providing the who,

what, when, where and how of the sources, as well as the who, what, when, where and how of the information those sources convey." *Institutional Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).

Courts evaluating statements made by confidential witnesses must look at "'the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.'" *Id.* at 261 (quoting *Chubb*, 394 F.3d at 147). The Third Circuit is specific: "[g]eneric and conclusory allegations based upon rumor or conjecture are indisputably insufficient to satisfy the heightened pleading standards of [the PSLRA]." *Id.* at 155. The complaint needs to provide not just the time during which the confidential witnesses worked at the company and their titles (Am. Compl. ¶¶ 25-35), but also the dates when the material information was acquired and descriptions sufficiently particular to show how the witness would have access to the information at issue. *Chubb*, 394 F.3d at 146, 148. Each source must meet the pleading requirements; "the sheer volume of confidential sources cited cannot compensate for these inadequacies." *Id.* at 155. Therefore, "cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA." *Id.*

### ii. Use of Confidential Witnesses in this Case

#### a. Do the Statements of the Confidential Witnesses Plead Material Misrepresentation?

Paragraphs 25-35 of the amended complaint provide the job titles of the confidential witnesses and the dates during which they worked for EDU Overseas. Five were document specialists, three were early-stage consultants, and the remaining three included a marketing specialist, a senior adviser, and a marketing manager. (Am. Compl. ¶¶ 25-35.) The amended

complaint pleads that "[a]ccording to former employees," the early-stage consultants provided the clients' "first contact with EDU Overseas," and they served as the students' "point of contact" throughout the application process.  (*Id.* ¶ 63.)  It further pleads that document specialists were "principally charged with ghost-writing applications.  All of the Former Employees confirmed that this includes students' personal statements and personal essays, and any other material purporting to have been drafted by the student."  (*Id.* ¶ 70.)

Of the 11 confidential witnesses, only two—both early-stage consultants and hereinafter identified as CW 2 and CW 3—worked at EDU Overseas during the class period (September 28, 2016 to December 1, 2016).[7]  (*Id.* ¶¶ 26, 27.)  As to the information they provide, "according to [CW] 2, it was New Oriental's policy never to allow students to access their own email account or application file.  When [CW] 3 encountered students who sought to have access to their own email accounts or applications, [CW] 3 would simply reiterate the policy."  (*Id.* ¶ 65.)

Confidential witnesses 1, 4, 6, 10 and 11 were employed prior to the class period as document specialists. The amended complaint states that, "according to [CW] 1, Document Specialists also ghost-wrote recommendation letters."  (*Id.* ¶ 70.)  "According to [CW] 7, the essential nature of the Document Specialists' job was ghost-writing, and ghost-writing was an essential part of the services EDU Overseas provided," and the phrases such as "quality of writing" and "importance of supporting documents" in EDU Overseas' advertisements, "according to [CW] 8," are really "code words boasting of the quality of Document Specialists' ghost-writing."   (*Id.* ¶ 71.)  "[CW] 5 and 6 both confirmed that Document Specialists almost

---

[7] That alone may not be enough to fully discount nine of the witnesses, but it certainly allows the Court to draw inferences about the extent and relevance of their knowledge.  *See In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 247 (8th Cir. 2008) (affirming dismissal of complaint in part because a confidential witness had left the company "well before the start of the class period.")).

always drafted academic essays for students." (*Id.* ¶ 73.) "According to [CW] 6, Document Specialists had to pass internal tests to prove their ghost-writing ability," and "[a]ccording to [CW] 11," Document Specialists were flown to training sessions to be taught writing skills. (*Id.* ¶ 74.) "Moreover," the amended complaint states, without crediting a specific former employee as the source, "Document Specialists were evaluated predominantly on their ability to write in English." (*Id.*)

Additionally, "according to [CW] 1 and 4," both document specialists, "the Document Specialists were instructed to personalize the application documents in order not to be discovered as ghost-written." (*Id.* ¶ 75.) "According to [CW] 11, EDU Overseas used firm-wide anti-plagiarism software similar to Turnitin [software used by academic institutions] on ghost-written documents to ensure that the submissions ***would not*** be identified as having been ghost-written by universities." (*Id.* (emphasis in amended complaint).) "According to [CW 3]," an early-stage consultant, if a student did not have an interesting enough personal story, "a Document Specialist would simply invent an anecdote illustrating a quality the student purported to have." (*Id.* ¶ 76.) Ghost-writing was celebrated at EDU Overseas; "according to [CW] 11, EDU Overseas gave out firm-wide awards recognizing the top employee performers in various categories," and the "award for the best Document Specialists, titled 'Golden Document Specialist,' was based on the quality of the recipient's ghost-writing." (*Id.* ¶ 82.)

The amended complaint does not directly quote statements from these confidential witnesses; each allegation begins with "according to." No details are given about how or when a confidential witness learned of the information he or she provides, or if the information comes from first-hand knowledge. The descriptions about the duties of document specialists are blanket statements sweeping all of these employees into application fraud activities.

The statements by CW 2 and CW 3, alleging that it was New Oriental's policy to maintain exclusive control over student email accounts, are also insufficient to surmount plaintiffs' pleading burden. Though they are the only two confidential witnesses employed during the class period, they do not speak to first-hand knowledge of ghost-writing because they were early-stage consultants. Nor do they provide any information about when they learned of the email policy, who told them, or in what manner the policy was communicated. Nor do the statements by document specialists CW 1, CW 4, CW 6, or CW 11 regarding their own practices meet the pleading standard because, in addition to not working for New Oriental during the class period, the "who, what, when, where, and how" of the allegations is lacking. Indeed, New Oriental noted at oral argument that those individuals could very well be the same individuals who were fired for ghost-writing. (Oral Arg. Tr. 6:13-16.)

In *Tellabs*, the Supreme Court held that a court "must consider[] not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. Here, such competing inferences defeat plaintiffs' claim. It is unremarkable that a company in the business of working with its clients on admission to overseas universities would expect employees working with writing samples to be proficient in writing skills and in the languages in which application materials would be submitted and communications with universities would take place. This, not an expectation or practice of ghost-writing, is the more likely inference from New Oriental's alleged practice of sending employees to writing skills workshop and hiring counselors who speak English. Similarly, the company's alleged use of antiplagiarism software is more likely explained by a desire to ensure students do not submit essays they found online rather than to ensure its own employees do not ghost-write using such sources.

Following *Tellabs*, this Court cannot credit the possible inferences of fraudulent activity when the inferences of innocent business practices are more plausible. None of the statements by confidential witnesses alleging material misrepresentation suffices to satisfy plaintiffs' pleading burden.

### b. Do the Statements of the Confidential Witnesses Plead Scienter?

New Oriental argues that not only do plaintiffs fail to allege, as required, a strong inference of scienter, they fail to allege scienter at all. The amended complaint states that "according to [CW] 8 . . . Zhou was heavily personally involved in EDU Overseas' day to day operations," he "personally selected managers," and he "adopt[ed] . . . their ghost-writing policies." (*Id.* ¶ 57.) CW 8 appears to give first-hand knowledge imputing fraudulent activity to Zhou. But this, too, falls short of pleading scienter. In addition to these statements not being direct quotes, CW 8 provides no explanation as to how s/he knew this, or when or what Zhou allegedly did to announce or create the policy of ghost-writing. Notably, CW 8 worked at the company as a marketing manager from 2008 to 2012, four years before the class period began. (*Id.* ¶ 32.) An absence of facts about documents, dates, timing, or meetings with Zhou render the CW's statements deficient. If the information attributed to CW 8 satisfied the particularity standard, as counsel for New Oriental noted, "anybody could say anything and could get past a motion to dismiss." (Oral Arg. Tr. 21:25-22:1.)

The other allegations of scienter are also insufficient. The amended complaint states that the confidential witnesses "were in agreement that it was impossible for management not to be aware of these facts." (Am. Compl. ¶ 80.) CW 3 believed it was "quite impossible" that management did not know of the ghost-writing practices; CW 4 found it "difficult to imagine" that management did not know; and CW 6 "scoffed at the idea" that management did not know

because "of course management knew." (*Id.*)  Notably, this is one of the few times that statements of confidential witnesses are given with direct quotes.

Notwithstanding the quotation marks, these statements alleging scienter are insufficient. *See GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) ("Of course, it is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false.")).   At oral argument, New Oriental made the point that these statements that management "must have known" amount to a "concession" that "they have no facts to say that management did know."  (Oral Arg. Tr. 22:8-9.)

The facts in the amended complaint do not indicate that New Oriental acted with the required state of mind, nor is the inference that New Oriental knew about the alleged fraud "at least as compelling as any plausible opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. The confidential witnesses admit to their own misdeeds and broadly paint their counterparts with the same brush.  When it comes to ascribing knowledge to management, however, they resort to "must have knowns" for support. Plaintiffs make no effort to supply plausible detail for the confidential witnesses' conclusion about management and Zhou, let alone a factual basis from which a strong inference can be drawn. As such, the amended complaint fails to allege scienter with the necessary particularity.

### B.  Section 20(a) Claim

As stated earlier, Section 20(a) supplies a cause of action against persons who directly or indirectly control any person liable under the Exchange Act or rules promulgated thereunder, making them jointly and severally liable with the controlled person for violations of the Act unless the controlling person acted in good faith and did not induce the violation. 15 U.S.C.

§ 78t(a).  Liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person. *Rahman*, 736 F.3d at 247; *Avaya*, 564 F.3d at 252.

Plaintiffs allege that Zhou is personally liable because he had "direct and supervisory involvement in the day-to-day operations of the company" and is "therefore presumed to have had the power to control or influence the particular transactions giving rise to the securities violations" alleged.  (Am. Compl. ¶ 134.)  But because, as discussed above, no Section 10(a) claim has been adequately pleaded, plaintiffs' claim against Zhou under Section 20(a) must likewise be dismissed.

## V.     Conclusion

Plaintiffs' amended complaint fails to state with particularity any material misrepresentation or omission by New Oriental or any facts that would allow a strong inference of scienter. Accordingly, the Court grants the motion to dismiss.  An appropriate order will issue.


                                                          /s/ Katharine S. Hayden
Date: July 3, 2019                                        Katharine S. Hayden, U.S.D.J.