**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Co-Lead Counsel for Plaintiffs and the Class

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AMY CHAN, STEVEN WADE, SHUNFENG CHENG, and ELBURN IRISH, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>v.<br><br>NEW ORIENTAL EDUCATION & TECHNOLOGY GROUP INC., and CHENGGANG ZHOU,<br><br>Defendants. | No.: 2:16-cv-09279-KSH-CLW<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Amy Chan, Steven Wade, Shunfeng Cheng, and Elburn Irish ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Complaint against Defendants New Oriental Education & Technology Group Inc. ("New Oriental," or the "Company"), and Chenggang Zhou, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. This Complaint is based upon the investigation conducted by and through Plaintiffs' attorneys and included, among other things, a review of Securities and Exchange Commission ("SEC") filings by New Oriental, English and Chinese media articles, analyst

reports about New Oriental, and discussions with former New Oriental employees. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired New Oriental American Depositary Shares ("ADSs") from September 28, 2016 through December 1, 2016, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Though New Oriental claimed to abide by Chinese laws and international academic norms mandating that students[1] themselves write the documents they submit to universities for admission, a New Oriental subsidiary founded by Defendant Chenggang Zhou and headed by him for seven years was secretly ghostwriting tens of thousands of university applications for its customers. Ghostwriting was not a deviation from the New Oriental subsidiary's business practices; it ***was*** that subsidiary's business practice. When *Reuters* reported on December 2, 2016 that the subsidiary committed rampant academic fraud, its stock price fell by 14%, damaging investors.

3. New Oriental offers educational services in the People's Republic of China ("China"). In its early days, New Oriental focused on offering language courses and foreign (*i.e.*, non-Chinese) standardized test preparation. As it succeeded in dominating that market, it entered other educational business fields.

---

[1] This Complaint refers to New Oriental's customers interchangeably as "students," "applicants," or "customers." Throughout, "Chinese" students are those who are from China rather than those who are ethnically Chinese.

4. One of these fields was admissions counseling. In October 2008, Defendant Chenggang Zhou became head of a then-moribund New Oriental subsidiary, Beijing New Oriental Vision Overseas Consulting Co., Ltd. ("EDU Overseas"), whose sole business was helping Chinese students apply to international – predominantly U.S. – universities. None of New Oriental's other subsidiaries were in this business. Before Chenggang Zhou took the reins, EDU Overseas earned only a few million dollars a year in revenues. By the time Zhou left it in January 2016, EDU Overseas earned $100 million in revenues – or almost 10% of all of New Oriental's revenues. Indeed, it was growing faster than the rest of New Oriental's business.

5. In its SEC filings, New Oriental claimed that EDU Overseas' business is to ***consult*** with Chinese students to ***assist*** them in applying to foreign schools. Defendants claimed in its filings that EDU Overseas ***tried*** to comply and as far as Defendants knew ***did*** comply with domestic (Chinese) regulations. Defendants specifically highlighted certain measures enacted by Beijing that prohibit agencies from ghostwriting application materials to submit to educational institutions.

6. Moreover, EDU Overseas is a member of the American International Recruitment Council ("AIRC"), a U.S. Standards Development Organization recognized by the Department of Justice. The AIRC mandates that its members discourage customers from hiring professionals to ghost-write application materials. The National Association for College Admission Counseling ("NACAC"), which counts at least half of U.S. universities as members, has a similar mandate. As does an association .

7. In fact, EDU Overseas did not comply with any of the Beijing measures, the AIRC's standards, or NACAC's standards. EDU Overseas' business was committing academic fraud.

8. EDU Overseas' clients, most of whom speak poor English, do not want someone to simply consult with them about universities. They want someone to draft their English-language personal statements, resumes, reference letters , and anything else they need to provide to the universities for them ("Application Documents"). And New Oriental delivers. After the student steps in for a quick initial consultation and fills out a questionnaire EDU Overseas' "consultants" ghostwrite the entire application. They ghostwrite the student's personal statement, taking care to invent stories about the student when necessary to make the student appear more interesting. They ghostwrite reference letters for the student's teachers to sign. When an application calls for the student to submit a previously-written academic essay, EDU Overseas consultants will ghostwrite that, too. Most students, about 70%, never even comment on "their" personal statements, reference letters, or essays; some students never even see "their" documents.

9. Other EDU Overseas employees act as the "intermediary" between the student and the universities to which the student is applying. These employees create fake email accounts that the employees use to correspond with the universities to which the student is applying. When corresponding with these universities, the employees impersonate the student. The employees also create fake application accounts. By creating a fake email address and a fake application account, EDU Overseas' employees ensure that the students never interact directly with the universities and thus never have a chance to sabotage their application by exposing their poor English.

10. These are not the isolated acts of a few bad apples. They are the very heart of EDU Overseas' business. A former employee who worked for EDU Overseas for the entire Class Period was baffled when asked whether EDU Overseas would fire employees for

ghostwriting, explaining that "our job is to write documents, why would we get fired for that?" Another former employee who worked at a different EDU Overseas office during the Class Period explained that ghostwriting "is part of my job responsibilities." A third employed during the Class Period at yet another office explained that, "I formally joined EDU Overseas to write [application] documents." A fourth said "I would write the student's personal statement and reference letters," a fifth that he would "compose application documents." A sixth explained that the students "can't write good application documents" and hire EDU Overseas" to write better documents." A seventh could not even imagine how EDU Overseas could operate without ghostwriting Application Documents. In fact, the form questionnaire EDU Overseas supplied to every customer to solicit information to ghostwrite applications warned that not all the information thus supplied would make its way into the ghostwritten application documents. That questionnaire showed to anyone who saw it that the application documents would be ghostwritten.

11. Others employed during the Class Period were told in their job interview that their job would be ghostwriting Application Documents, while another responded to an advertisement seeking a good ghostwriter. Yet more EDU Overseas employees confirmed that this same practice occurred before and after the Class Period. Overall, 27 former employees from 14 different EDU Overseas offices reported that ghostwriting documents and impersonating students was standard operating procedure in their office – employees' daily work responsibilities.

12. EDU Overseas annually recognizes its best ghostwriters through its Golden Document Specialist awards. A former employee who worked for EDU Overseas during the Class Period and who received the award boasted that he had earned the award "because my

writing quality was better" – defining "writing quality" as "the quality of the documents ***I write***, which includes personal statements and resumes."

13. Online complaints likewise showed that students paid EDU Overseas for ghostwriting rather than advice. Some students protested that the Application Documents EDU Overseas ghostwrote for them "lack custom-made personalization" and were "boilerplate." One student who evidently had never read the application documents EDU Overseas submitted on his behalf blamed EDU Overseas poor work product after the application was rejected, stating that the application omitted information that the student had supplied. Another student grumbled that "I can't believe I am picking grammar and wording mistake for the EDU Overseas document specialist, sentence by sentence" – complaining that the student had to waste time polishing the work EDU Overseas had done though it was represented to the universities that the work was entirely the student's.

14. Plaintiffs obtained an executed form contract between EDU Overseas and one of its customers that includes an itemized price for application documents. Two former employees, shown the contracts, confirmed that the price list was for ghostwriting application documents. The Application Contract also warns students that if they want a full refund they should ask for one quickly because EDU Overseas would begin work on the application documents seven days after execution.

15. On December 2, 2016, *Reuters* reported, among other things, that EDU Overseas routinely ghostwrote personal statements and application essays for its customers.[2] The *Reuters* journalists also obtained an EDU Overseas contract, which contained similar provisions to those

---

[2] The *Reuters* article is attached as Exhibit 1 to this filing and incorporated by reference.

in the contract Plaintiffs obtained here. *Reuters* also reported that the AIRC was investigating EDU Overseas' misconduct.

16. The *Reuters* revelations shocked the market, causing the price of New Oriental's ADSs to fall over 14% from its previous close, damaging investors.

17. EDU Overseas took thousands of dollars from students with poor English and drafted their applications for them. In so doing, EDU Overseas enabled these students to take up spots for which they were ill equipped due to their poor English language abilities, over other more scrupulous or poorer students. Zhou built a machine that makes a quick buck for New Oriental by selling services that harmed the universities, other students, and even – as they would later discover – the customers who bought EDU Overseas' services.

## JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

19. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

20. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as a substantial part of the conduct complained of herein and subsequent damage occurred in this District.

21. In connection with the acts, conduct, and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

22. Plaintiffs Amy Chan, Steven Wade, Irish Elburn, and Shunfeng Cheng, as set forth in their PSLRA Certifications previously filed and incorporated by reference, acquired New Oriental ADSs at artificially-inflated prices during the Class Period and were damaged thereby.

23. Defendant New Oriental is a Cayman Islands corporation headquartered in Beijing, China. New Oriental provides private educational services under the New Oriental brand in China. New Oriental ADSs trade on the New York Stock Exchange ("NYSE") under the ticker symbol "EDU."

24. Defendant Zhou has served as a director of the Company since March 2007, as President between January 2016 and September 2016, and has served as CEO since September 2016. From 1998 to 2000, Zhou worked for the BBC as a Correspondent for the Asia Pacific Region and Program Host. He holds a Master's degree in Communications from Macquarie University in Australia. Zhou joined EDU Overseas in 2008 and headed it until January 2016.

25. Collectively, New Oriental and Zhou are the "Defendants."

26. New Oriental is liable for the acts of Zhou and its employees under the doctrine of *respondeat superior* and common law principles of agency, as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

27. The scienter of Zhou and other employees and agents of the Company is similarly imputed to New Oriental under *respondeat superior* and agency principles.

**FORMER EMPLOYEES**

28. EDU Overseas employs two types of application consultants. These are Early Stage Consultants, who interface with students, and Document Specialists,[3] who ghostwrite the students' Application Documents.

29. Former Employee 1 ("*FE 1*")[4] was a Document Specialist in EDU Overseas' Beijing office between October 2015 and January 2016. *FE 1* worked on applications to U.S. colleges. *FE 1*'s main responsibility was ghostwriting documents which EDU Overseas submitted under the student's name in applications, including personal statements, essays, resumes, reference letters, and the like ("Application Documents").[5] The job responsibilities set out in this Paragraph were *FE 1*'s from the moment *FE 1* started at EDU Overseas. *FE 1* thus learned of the practices from *FE 1*'s first day at work, at the latest.

30. Former Employee 2 ("**FE 2**")[6] was an Early-Stage Consultant in EDU Overseas' Guangzhou office between July 2016 and January 2017. **FE 2**'s job responsibilities included meeting with students to obtain information to ghostwrite Application Documents, setting up email addresses, and using the email addresses to correspond directly with the universities to which the student applied while impersonating the student. **FE 2** worked on applications to U.S.

---

[3] The Chinese-language title for Early-Stage Consultants is 前期顾问, while the formal Chinese-language title for Document Specialists is 后期顾问.

[4] The appellations of Former Employees who worked for EDU Overseas in the year that ended on May 31, 2016, are italicized

[5] According to Former Employee 23, "'Documents' refer to the same thing as files. They can be used interchangeably in our work. They refer to the student's application documents, including documents like resumes, personal statements, reference letters. Whatever written materials a school requires students to submit in the course of application, we call the aggregate of them 'documents.'" Former Employee 26 agreed that "'document' is a word widely used [] at EDU Overseas[.] 'Document' refers to things like resumes, personal statements, and reference letters."

[6] The appellations of Former Employees who worked for EDU Overseas during the Class Period are bolded.

colleges. The job responsibilities set out in this Paragraph were **FE 2**'s from the moment **FE 2** started at EDU Overseas. **FE 2** thus learned of the practices from **FE 2**'s first day at work, at the latest. **FE 2** was not fired, but instead left for a better job.

31. Former Employee 3 ("**FE 3**") was an Early Stage Consultant in EDU Overseas' Kunming office between April 2016 and November 2016. **FE 3**'s job responsibilities included meeting with students to obtain information to ghostwrite Application Documents, setting up email addresses, and using the email addresses to correspond directly with the universities to which the student applied while impersonating the student. **FE 3** worked on applications to U.S. colleges. The job responsibilities set out in this Paragraph were **FE 3**'s from the moment **FE 3** started at EDU Overseas. **FE 3** thus learned of the practices from **FE 3**'s first day at work, at the latest.

32. Former Employee 4 ("*FE 4*") was a Document Specialist in EDU Overseas' Zhengzhou office between April 2015 and July 2015. *FE 4*'s main responsibility was ghostwriting Application Documents. *FE 4* worked on applications to U.S. colleges. According to *FE 4*, EDU Overseas' Zhengzhou office was one of its most profitable. The job responsibilities set out in this Paragraph were *FE 4*'s from the moment *FE 4* started at EDU Overseas. *FE 4* thus learned of the practices from *FE 4*'s first day at work, at the latest.

33. Former Employee 5 ("FE 5") was a Marketing Specialist at EDU Overseas' Zhengzhou office between December 2012 and July 2014. FE 5's job responsibilities included pitching EDU Overseas' services to potential customers, including its ghostwriting services.

34. Former Employee 6 ("FE 6") was a Document Specialist at EDU Overseas' Zhengzhou office between February 2011 and August 2013. FE 6's main responsibility was ghostwriting Application Documents. The job responsibilities set out in this Paragraph were FE

6's from the moment FE 6 started at EDU Overseas. FE 6 thus learned of the practices from FE 6's first day at work, at the latest.

35. Former Employee 7 ("FE 7") was a Senior Advisor in the U.S. Department in EDU Overseas' Beijing office, its headquarters, between July 2013 and March 2015. FE 7 reports that Defendant Zhou worked in EDU Overseas' Beijing office.

36. Former Employee 8 ("FE 8") was a Marketing Manager in the U.S. Department in EDU Overseas' Zhengzhou office between July 2008 and January 2012. During his time at EDU Overseas, FE 8 spoke and interacted with Chenggang Zhou. FE 8 oversaw EDU Overseas publicity campaigns and recruitment of personnel, including of Document Specialists.

37. Former Employee 9 ("*FE 9*") was an Early-Stage Consultant from December 2014 to July 2016 in EDU Overseas' Qingdao office. *FE 9*'s job responsibilities included meeting with students to obtain information to ghostwrite Application Documents, setting up email addresses, and using the email addresses to correspond directly with the universities to which the student applied while impersonating the student. The job responsibilities set out in this Paragraph were *FE 9*'s from the moment *FE 9* started at EDU Overseas. *FE 9* thus learned of the practices from *FE 9*'s first day at work, at the latest.

38. Former Employee 10 ("FE 10") was a Document Specialist from September 2012 to May 2015 in EDU Overseas' Wuhan office. FE 10's main responsibility was ghostwriting Application Documents. The job responsibilities set out in this Paragraph were FE 10's from the moment FE 10 started at EDU Overseas. FE 10 thus learned of the practices from FE 10*'s* first day at work, at the latest.

39. Former Employee 11 ("FE 11") was a Document Specialist in EDU Overseas' Changsha office from July 2011 through February 2015. FE 11's main responsibility was

ghostwriting Application Documents. The job responsibilities set out in this Paragraph were FE 11's from the moment FE 11 started at EDU Overseas. FE 11 thus learned of the practices from FE 11's first day at work, at the latest.

40. Former Employee 12 ("**FE 12**") was a Document Specialist in EDU Overseas' Taiyuan Office between September 2014 and June 2019. **FE 12**'s principal job responsibility was "writing application documents" such as "personal statements, reference letters, and so on." The job responsibilities set out in this Paragraph were **FE 12**'s from the moment **FE 12** started at EDU Overseas. **FE 12** thus learned of the practices from **FE 12**'s first day at work, at the latest. **FE 12** worked at EDU Overseas for the entire Class Period.

41. Former Employee 13 ("**FE 13**") was a Document Specialist in EDU Overseas' Hefei office from October 2014 to November 2017. **FE 13**'s job responsibilities included "writing application documents," specifically citing personal statements, reference letters, resumes, and sometimes essays. The job responsibilities set out in this Paragraph were **FE 13**'s from the moment **FE 13** started at EDU Overseas. **FE 13** thus learned of the practices from **FE 13**'s first day at work, at the latest. **FE 13** was not fired but instead resigned for personal reasons. **FE 13** worked at EDU Overseas for the entire Class Period.

42. Former Employee 14 ("FE 14") was an intern at EDU Overseas' Shanghai office from June 2017 through January 2018. FE 14's job responsibilities included ghostwriting Application Documents. FE 14 completed FE 14's internship and obtained a Master's degree but did not seek further employment from EDU Overseas because the ghostwriting industry has little to do with the subject of FE 14's master's degree.

43. Former Employee 15 ("FE 15") was a Document Specialist in EDU Overseas' Nanchang office from April 2017 through September 2018. FE 15's job responsibilities included writing Application Documents and hiring Document Specialists.

44. Former Employee 16 ("**FE 16**") was a Document Specialist in EDU Overseas' Hefei office from August 2016 through November 2017. **FE 16's** responsibilities included writing "all" the student's Application Documents. **FE 16** was not fired, but instead left EDU Overseas to take up a job at a competitor. The job responsibilities set out in this Paragraph were **FE 16's** from the moment **FE 16** started at EDU Overseas. **FE 16** thus learned of the practices from **FE 16's** first day at work, at the latest. **FE 16** worked at EDU Overseas for the entire Class Period.

45. Former Employee 17 ("FE 17") was a Document Specialist in EDU Overseas' Changsha office from November 2018 through February 2019. FE 17's job responsibilities included writing Application Documents. The job responsibilities set out in this Paragraph were FE 17's from the moment FE 17 started at EDU Overseas. FE 17 thus learned of the practices from FE 17's first day at work, at the latest.

46. Former Employee 18 ("**FE 18**") was a Document Specialist employed by EDU Overseas from March 2015 through May 2017. **FE 18's** responsibilities included writing Application Documents. **FE 18** was not fired, but instead resigned from EDU Overseas to move to a different industry. **FE 18** worked for EDU Overseas for the entire Class Period. The job responsibilities set out in this Paragraph were **FE 18's** from the moment **FE 18** started at EDU Overseas. **FE 18** thus learned of the practices from **FE 18's** first day at work, at the latest.

47. Former Employee 19 ("**FE 19**") was a Document Specialist in EDU Overseas' Wuhan Office from April 2016 through May 2019. According to **FE 19**, "[w]hen I started, I was

asked to compose English application documents, yes, on behalf of the students. My job stayed the same during my tenure." **FE 19** principally worked on United States Master's degree applications. The job responsibilities set out in this Paragraph were **FE 19's** from the moment **FE 19** started at EDU Overseas. **FE 19** thus learned of the practices from **FE 19's** first day at work, at the latest.

48. Former Employee 20 ("**FE 20**") was a Document Specialist in EDU Overseas' Nanjing Office from August 2016 through December 2016. According to **FE 20**, "when I started to work in this latter phase document specialist position, my job responsibility was to write application documents for the students."

49. Former Employee 21 ("**FE 21**") was a Document Specialist in EDU Overseas' Suzhou office from August 2018 through March 2019. According to **FE 21**, "we Document Specialists are mainly in charge of writing application documents." The job responsibilities set out in this Paragraph were **FE 21's** from the moment **FE 21** started at EDU Overseas. **FE 21** thus learned of the practices from **FE 21's** first day at work, at the latest.

50. Former Employee 22 ("**FE 22**") was a Document Specialist in EDU Overseas' Hunan office from September 2015 through July 2017. **FE 22** explained that the "[b]asic procedure is to communicate with the student about the contents of the Application Documents, brainstorm with them" and then "write the Application Documents." The job responsibilities set out in this Paragraph were **FE 22's** from the moment **FE 22** started at EDU Overseas. **FE 22** thus learned of the practices from **FE 22's** first day at work, at the latest.

51. Former Employee 23 ("**FE 23**") was a Document Specialist in EDU Overseas' Chongqing office from September 2016 through January 2017. **FE 23**'s main responsibility was ghostwriting Application Documents. **FE 23** worked on applications to U.S. universities. The job

responsibilities set out in this Paragraph were **FE 23's** from the moment **FE 23** started at EDU Overseas. **FE 23** thus learned of the practices from **FE 23's** first day at work, at the latest.

52. Former Employee 24 ("**FE 24**") was a Document Specialist in EDU Overseas' Beijing office from June 2016 through December 2016. **FE 24** explained that "I was in charge of writing Application Documents at EDU Overseas." The job responsibilities set out in this Paragraph were **FE 24's** from the moment **FE 24** started at EDU Overseas. **FE 24** thus learned of the practices from **FE 24's** first day at work, at the latest.

53. Former Employee 25 ("**FE 25**") was a Document Specialist in EDU Overseas' Shanghai office from August 2015 through September 2018. **FE 25**'s main responsibility was ghostwriting Application Documents. The job responsibilities set out in this Paragraph were **FE 25's** from the moment **FE 25** started at EDU Overseas. **FE 25** thus learned of the practices from **FE 25's** first day at work, at the latest.

54. Former Employee 26 ("**FE 26**") was a Document Specialist in EDU Overseas' Shanghai office from February 2016 through November 2016. **FE 26**'s main responsibility was ghostwriting Application Documents. The job responsibilities set out in this Paragraph were **FE 26's** from the moment **FE 26** started at EDU Overseas. **FE 26** thus learned of the practices from **FE 26's** first day at work, at the latest.

55. Former Employee 27 ("**FE 27**") was a Document Specialist in EDU Overseas' Nanjing office from July 2015 through August 2018. **FE 27**'s main responsibility was to take the information students provided, "such as their personalized stories and their own thoughts," and to use these materials "to write application documents."

***Sources of the Former Employees' Knowledge***

56. The Former Employees knew about EDU Overseas' unethical practices, as set forth in ¶¶86-160 below, *because it was their job to perform such practices*. Indeed, **FE 19** applied for the job ***because*** he believed he could put his English writing skills to use ghostwriting Application Documents. **FE 13**, **FE 21**, and FE 14 even recall discussing at their interviews that their job would require ghostwriting. The EDU Overseas job advertisement to which **FE 22** responded indicated that the job's main responsibility was ghostwriting Application Documents. And **FE 18** did piecework ghostwriting for EDU Overseas even before he took up a job there.[7]

57. Each student was assigned at least one Early Stage Consultant and at least one Document Specialist. Early Stage Consultants and Document Specialists worked closely together. For example, **FE 13** reports that the Early Stage Consultant and Document Specialist frequently jointly attended the student's intake interviews. ¶92. **FE 13** also reports that "internally we [Document Specialists and Early Stage Consultants] all emailed [finished Application Documents] to each other." Likewise, **FE 3** reported that he worked with Document Specialists to invent "telling" anecdotes if the information the student provided was too dull or unimpressive. ¶106. Because of their close interactions, Document Specialists and Early Stage Consultants developed an understanding of the others' tasks and practices.

## BACKGROUND

58. New Oriental offers a range of educational programs, services, and products, including English and foreign language training, test preparation courses for admissions, and

[7] Appendix B summarizes whether each Former Employee made particularized allegations about each of five widespread practices: using intake practices to obtain information to ghostwrite, ghostwriting, use of templates, practice of students not to edit "their" application documents, training employees to ghostwrite and rewarding them as such, and impersonating students to the universities to which they applied.

assessment tests. It boasts that it is the largest provider of private educational services in China based on number of program offerings, total student enrollments, and geographic presence.

59. New Oriental describes one of its main business lines as admissions consulting for international studies, which it conducts through its subsidiary, EDU Overseas. New Oriental has described this business as simply assisting students in their applications to international schools. *See* ¶¶165-82.

***International students***

60. The whole world acknowledges the value of an education at a U.S. university. A degree from a U.S. school opens doors both for international graduates who return to their home countries and for those who remain in the U.S. The Chinese market particularly values a U.S. degree.

61. Since the middle of the 2000's, an increasingly prosperous Chinese middle class has been ever more willing and able to pay for a U.S. education.

62. Enrollment of Chinese students in the U.S. has, accordingly, soared:




**Year represents end of academic year.*

Source: Te-Ping Chen and Miriam Jordan, Why So Many Chinese Students Come to the U.S., *The Wall Street Journal*, May 1, 2016

63. The total number of students leaving China to study abroad increased from 144,000 in 2008, to 523,700 in 2015.

64. At the same time, the demographics of Chinese students studying abroad has changed. According to the New York Times, in the mid 2000's only one fifth of Chinese students in the U.S. were undergraduate students; by the middle of the 2010's, about half were.

65. These relatively inexperienced students from relatively prosperous families have created opportunities not just for themselves but also for businesses that cater to their needs.

66. New Oriental historically dominated the market for Chinese students seeking to prepare to take foreign admissions tests like the SAT.

67. In 2008, Zhou was appointed head of EDU Overseas. He saw an opportunity to expand New Oriental's business by following the practices of more established but dubious competitors. In time, Zhou would grow EDU Overseas' revenues from a few million a year to over $100 million.

68. New Oriental billed EDU Overseas' services to the outside world and investors as "admissions counseling." According to New Oriental, EDU Overseas merely "advises" students on their course of study and "assists" them in seeking admission. ¶¶165-182. In truth, though, and as set out below in ¶¶94-154, the students had little involvement in preparing "their" application. EDU Overseas' "consultants" ghostwrote the personal statements, essays, reference letters, and resumes that students submitted to universities as their own. ¶¶94-143. The students did not even submit the Application Documents EDU Overseas ghostwrote for them, as EDU Overseas created email accounts to apply for and communicate with the universities in place of the applicant. ¶¶144-154. As several former employees stated, EDU Overseas offered the students "full service" – and that meant doing for the students everything the students were supposed to do themselves. ¶¶123.

***Admissions Counselor Regulatory Associations Prohibit Ghostwriting, a Form of Academic Fraud***

69. Presenting the work of another as one's own in a university application is considered a violation of academic integrity. It is a form of academic fraud.[8]

70. The AIRC is the leading Standards Development Organization regulating international student recruitment. It is recognized by the DOJ and the Federal Trade Commission and has 268 institutional members.

71. EDU Overseas became a member of the AIRC in 2012.

72. The AIRC requires organizations seeking membership to demonstrate, and existing members to maintain, adherence to a code of conduct. The AIRC's code of conduct did not change between 2012 and the close of the Class Period.

73. This code of conduct requires that "the [admissions consulting] agency [like EDU Overseas] conduct[] itself in a transparent manner in which only truthful claims are made, and both institutions and students are served in an unbiased manner." AIRC Code, 2.6.

74. The code of conduct further prohibits "the agency [from] knowingly provid[ing] false or misleading records of student academic achievement" while requiring that it "ensure[] that essays and/or statement of purpose are originally created by the student to whom they are attributed." *Id.*, 4.1.5.

75. The National Association for College Admission Counseling ("NACAC") is an organization of nearly 16,000 professionals and institutions the postsecondary admissions field.

---

[8] See Appendix A hereto, incorporated by reference.

76. As of December 2012, half of NACAC's members were postsecondary institutions.[9] As of 2010, at least 2,500 U.S. colleges were members,[10] or about half of all colleges nationwide.[11]

77. The NACAC has promulgated a Statement of Principles and Good Practice, which provides, in relevant part, that "[a]ll counseling members should [] encourage students to be the sole authors of their applications and essays and counsel against inappropriate assistance on the part of others."

78. Accordingly, both the NACAC and AIRC prohibited ghostwriting applications.

***EDU Overseas was a large and high-margin portion of New Oriental's business***

79. Zhou became EDU Overseas' President (its overall head) in 2008, and would continue in this position until January 2016, when he became New Oriental's President.

80. When Zhou became EDU Overseas' head, it had few operations. Indeed, its total 2008 revenues were approximately RMB 28 million, or a few million dollars.

81. EDU Overseas grew thirty-fold under Zhou's leadership. In the fiscal year ended May 31, 2015, EDU Overseas earned revenues of more than RMB 700 million, or more than a hundred million dollars.

82. According to FE 8, through at least 2009, Zhou immersed himself in EDU Overseas' day-to-day operations. Indeed, according to FE 8, Zhou personally selected the

---

[9] "NACAC History 2010s", NACAC, NACAC, 10/31/2016 available at https://www.nacacnet.org/globalassets/documents/about/history/nacac_history-timeline_2010s.pdf, p.7.

10 "A View of the *U.S. News & World Report* Rankings of Undergraduate Institutions from the College Admission Counseling Perspective", NACAC, NACAC, 11/2/2016, available at https://www.nacacnet.org/globalassets/documents/knowledge-center/college-rankings/usnewrankingsreport-survey.pdf, p. 18.

11 "How many colleges and universities do we really need?", Jeffrey J. Selingo, Washington Post, 7/20/2015, available at https://www.washingtonpost.com/news/grade-point/wp/2015/07/20/how-many-colleges-and-universities-do-we-really-need/

managers of the 6 EDU Overseas offices that he established by 2009. According to FE 8, Zhou also adopted for EDU Overseas the strategies of already-existing unscrupulous admissions "consulting" firms such as Jinjilie Overseas Study, including specifically their ghost-writing practices.

83. New Oriental built its reputation on helping Chinese students go to school abroad. It continues to profess the goal of opening the world to these students. Indeed, on the call to discuss Q1 2016 earnings on October 10, 2015, New Oriental founder Michael Yu: (a) promised that he would personally attend to the overseas test preparation and consulting business; (b) expressed hope that the overseas test preparation and consulting businesses would grow substantially; and (c) stated that these businesses were part of New Oriental's essence:

> Julia, let me add some points. I myself am very interested in overseas test preparation, as you know that I'm from that area, New Oriental started from that area. We can see that there is a slowing down of the number of students who want to go abroad to study because the number almost has reached the top, because not every family can afford for their kids to study overseas.
>
> But I still feel regretting that New Oriental is not growing as fast as possible. Of course one of the reasons is number of students is not growing all over China for overseas. But another reason is that for those past two or three years we have paid a great attention to K-12 education, so we have put some of our resources in K-12, ***but from this year my personal attention and New Oriental's also some of the resources will come back to overseas test preparations because in my mind this is a great area to help Chinese people to have a bright future***.
>
> So for the rest of the year and for the next several years, you can see that we will also build up some great systems for students who are studying overseas. And also I personally will put more of my attention in this area and maybe we'll do more next lectures and also some encouragement for students to study in this area. So I'm pretty sure that the growth will not only come from the price increase even though we have space in this area to raise price, but I'm also pretty sure that by our efforts, more students will choose New Oriental to study for their test preparations ***and also choose New Oriental for their consulting overseas studies in universities.***
>
> So I'm expecting not only 10% increase in this area, I'm expecting for the next several years maybe more than 10%, I don't know how much but 10%, 15% is my expectation or even better than that. That's not my promise, but that's what I want

> to say that's my efforts in this area because this is where we start out. ***It's kind of like if you're familiar with Chinese history, it's like Yan'an in Chinese history for Communist party, we cannot lose that.***

84. New Oriental did not as a matter of course inform investors of EDU Overseas' financial metrics independent of its overseas test preparation business but it sometimes provided specific financial metrics in response to questions. For example, in a call to discuss Q3 2016 earnings taking place on April 19, 2016, New Oriental CFO Zhihui Yang observed that EDU Overseas contributed 8-9% to New Oriental's total revenues. Yang added that EDU Overseas' operating margins were about 20% – much higher than New Oriental's contemporaneous overall operating margins of 12%. Because of its high margins, EDU Overseas accounted for between 13.1% (at 8% of revenue) and 14.8% (at 9% of revenue) of New Oriental's operating income that quarter.

85. Moreover, unlike New Oriental's test preparation business, EDU Overseas was growing rapidly. For example, on April 20, 2016, following the Q3 2016 Earnings Call, a Credit Suisse analyst published a report noting that EDU Overseas' revenues had grown by 25% against Q3 2015, and predicting that it would grow again by 25% in FY 2017. New Oriental's overall revenues had increased only 20.6%, and were projected to increase only 16.1%, over the same periods.

## DEFENDANTS' MISCONDUCT

### *EDU Overseas' Business is Academic Fraud*

86. EDU Overseas' business is committing academic fraud to help Chinese students gain admissions to international schools. As the Former Employees reported, EDU Overseas takes its customers through an assembly-line process which varied little by office or time. As set out in ¶¶87-93, Early Stage Consultants and Document Specialists first obtained biographical

information from the students. Then, as set out in ¶¶94-143, Document Specialists used the information to ghostwrite Application Documents. Finally, as set out in ¶¶144-154, Early Stage Consultants submitted the ghostwritten documents to and corresponded with the universities. Two former employees described the process as "full service" because it leaves little for the student to do. ¶¶123.

***Early Stage Consultants Obtain Biographical Information About Students***

87. According to **FE 2**, Early Stage Consultants find customers, either by responding to prospective students who contacted New Oriental or by finding prospective students online**.** Then, **FE 2** continues, Early Stage Consultants invite the student to EDU Overseas' offices for a discussion. The discussion serves either as a sales pitch or as an intake meeting.

88. When New Oriental signs up a new customer, the Early Stage Consultant and Document Specialist jointly gather information about the student, as further set out in ¶¶88-93. EDU Overseas obtains information by having the student answer a questionnaire ("intake questionnaire"). **FE 23** reports that "all of EDU Overseas used the same questionnaire, I did not write it." **FE 23** further explained that "[t]he questionnaire is in Chinese and is very detailed, it has several pages, all students have to fill it in."

89. **FE 23** further describes the questionnaire as "hav[ing] several sections, including the student's basic information, academic results, description of work or intern experience, and awards or honors," stating that this information "will be used for writing the student's resume." **FE 23** adds that "there is another section primarily used to write the student's personal statement, the questions include why the student wants to apply for this specific program, and what are the student's motivations, study plans, and career plans." **FE 23** continues that "there is another section related to the reference letter." For this section, according to **FE 23**, "the student has to

find the teacher the student has decided will write the reference letter." According to **FE 23**, the teacher will then fill in the form, including "the teacher's impression of the student, the student's academic performance, any remarkable performances, things like that." Then, **FE 23** and other Document Specialists will "use the information to write reference letters." In sum, **FE 23** explained, the "questionnaires are made for the Document Specialists to read so that they can use the information to compose the student's Application Documents."

90. **FE 23** also reported that "[w]e might not include all the information the student wrote on the questionnaire in the Application Documents we write." Problematically, therefore, **FE 23** notes, "some students would ask us afterwards why we did not include some of the information they provided in the questionnaire." To address this problem, **FE 23** explains, the form questionnaire EDU Overseas used ***for every single customer*** disclaims that not all the information the student provides will be used ***in the Application Documents EDU Overseas will ghostwrite for the student.***

91. **FE 13** echoes **FE 23's** explanation. According to **FE 13**, the questionnaire is not designed by the employee who administers it, stating that instead "I did not draft the [intake] questionnaire," it "is prepared by other colleagues ***and the [intake] questionnaire is used by the whole company***." According to **FE 13**, "the [intake] questionnaire was meant to gather writing inspiration from students, otherwise it would be difficult to write documents." **FE 13** added that "my writing was basically based on the questionnaires."

92. New Oriental employees will also conduct "intake meetings" to gather additional information. According to **FE 13**, "further writing material was gathered from the student through face to face discussion." **FE 13** reports that **FE 13** personally, and other Document Specialists as well, "meet the student once or twice to learn information which we can use in our

writing," adding that "sometimes the Early Stage consultant of that student was present as well." After the intake meeting, **FE 13** reports, "then we can write [the Application Documents] based on the information gather from the [intake] questionnaire" and intake meeting. According to FE 15, "[w]hen writing documents, we discussed with students, and then the document specialist wrote the documents."

93. Other sources confirm **FE 23**, **FE 13** and FE 15's accounts. **FE 22** explains that "I would, based on the information in the questionnaire, translate and write personal statements and reference letters for the student." *FE 1* confirmed that in EDU Overseas' Beijing Office, throughout *FE 1*'s tenure, students answered questionnaires and could, if they wanted to, meet with EDU Overseas to provide additional information. *FE 1*, **FE 3**, and *FE 4* confirmed that Document Specialists later used this information to ghostwrite Application Documents. *FE 4* specifically mentioned as examples personal statements, essays, resumes, and reference letters. *FE 1*, **FE 3**, *FE 4*, **FE 13**, and FE 15 corroborate that they learned from the moment they began their employment at EDU Overseas that it was standard operating procedure to gather information from intake questionnaires and intake meetings which Document Specialists used to draft Application Documents.

***Document Specialists Use the Information Elicited to Ghostwrite Student Applications***

94. The Document Specialists then use the information the students provided in intake questionnaires and intake meetings to draft the students' Application Documents. As set out in ¶¶95-113, former EDU Overseas employees reported that Document Specialists did not ghostwrite occasionally and furtively; ***ghostwriting was their job***. It was their daily work responsibility. Four employees were told at their job interviews, or before, that their jobs would be ghostwriting. ¶¶107-110. Six former EDU Overseas employees independently reported that

EDU Overseas used internal templates to draft Application Documents, showing that the Application Documents were not the students' own work. ¶¶115-122. Five former EDU Overseas employees independently reported that very few students provided any original Application Documents, and that the majority never even commented on the Application Documents EDU Overseas drafted. ¶¶123-126. Three former EDU Overseas employees reported that EDU Overseas used an award, the Golden Document Specialist, to reward its best ghostwriters – and one of these two employees bragged that he himself had won the Golden Document Specialist award because he ghostwrote better than other employees. ¶¶128-131. An application contract ("Application Contract") obliged EDU Overseas to draft Application Documents, as interpreted by two former EDU Overseas employees. ¶¶132-137. And the exorbitant cost of EDU Overseas' services confirm that EDU Overseas does not merely provide consultation. ¶¶140-143.

**Former Employee Report that Ghostwriting Was Their Job**

95. As set out in ¶¶96-113, numerous former employees, dispersed throughout EDU Overseas' offices, reported that the Document Specialists' main job was ghostwriting Application Documents.

96. **FE 13**, who worked in EDU Overseas' Hefei office, reported it was **FE 13's** job to ghostwrite Application Documents, including personal statements, reference letters, resumes, and sometimes essays. **FE 13** explained that ***FE 13***, and not the student, drafted ***all*** the Application Documents. Asked whether any EDU Overseas employees were fired for ghostwriting, **FE 13** was baffled: "Our job is to write documents, why would we get fired for that?" **FE 13** added that if they fired document specialists for ghostwriting, "they'll have to fire the whole team." **FE 13** added that if **FE 13** does not ghostwrite Application Documents, **FE 13**

has not done **FE 13's** job. Indeed, **FE 13** pointed out, "if I could get paid without writing anything, why would I go through all the trouble of writing application documents for the students?" Asking again weeks later whether anyone would be fired for ghostwriting only exasperated **FE 13**: "I already said that, ***no one was fired for that***."

97. **FE 3** similarly reported that EDU Overseas did not fire a single Document Specialist for ghostwriting in Kunming. **FE 26** scoffed at the question: "Getting fired for writing application documents? Never."

98. FE 5 in Zhengzhou could not recall instances of EDU Overseas employees questioning the ethics of ghostwriting applications in any ***particular*** case, ***because ghostwriting was EDU Overseas' business***. Indeed, according to FE 10, who worked in Wuhan, EDU Overseas even ghostwrote PhD applications.

99. A host of Former Employees reported that their job was ghostwriting Application Documents. **FE 25**, an employee of EDU Overseas' Shanghai office, reported that "shortly after joining, you will get writing tasks assigned to you by your team leader." **FE 24**, from Beijing, complained that while "I was in charge of writing application documents at EDU Overseas [] EDU Overseas value communication with the students over the quality of the application documents." **FE 21** proudly noted that "I think students are quite satisfied with my writing quality," crediting the fact that "I listen to the student's opinions, and will show the student the application documents after finishing." Of the job, **FE 21** admitted that "Document Specialists have to prepare a lot of application documents during their busy season and this can be quite stressful."

100. Likewise, **FE 12,** who worked in Wuhan, stated that "[m]y job includes writing application documents." **FE 12** further explained that application documents means "personal

statements, reference letters, and so on." **FE 12** made clear that "it is part of my job responsibilities."

101. Other former EDU Overseas employees confirmed these accounts. **FE 19**, working out of EDU Overseas' Wuhan office, told Plaintiffs that "I was hired to work in Document Specialist position because my English writing skills were recognized and needed," and added that "when I was hired, I was asked to compose English application documents on behalf of the students." **FE 19** applied for the job because "my last job before EDU was English translation, and therefore I can say my English skills and experience make me suitable for the document specialist position, which required English writing skills." **FE 19** planned to put this experience to use ghostwriting Application Documents: "I hoped to use my writing skills at work so I didn't consider applying for an Early Stage Consultant position." Indeed, **FE 19** was paid commissions based on the number of Application Documents **FE 19** ghostwrote, stating "the commission is basically calculated depending on how many pieces I wrote and how many successful cases I have been involved in. ***To earn more, you basically try to write more.***"

102. **FE 21,** from EDU Overseas' Suzhou office, also stated that **FE 21** and other Document Specialists' main responsibility was to draft Application Documents: "***We Document Specialists are mainly in charge of writing application documents***." Like **FE 19**, **FE 21** explained that **FE 21** received commissions if the students whose applications **FE 21** ghostwrote were accepted: "Document specialists also have commissions, it is based on the number of successful student cases we handled. In application season, you work on more cases, and try to write more application documents, then you'll get better commissions." **FE 24** explained that commissions "are based on how many students you worked for."

103. **FE 20**, Nanjing, made the same point: "when I started to work in this Document Specialist position, my job responsibility was to write application documents for the students." **FE 20** added that ghostwriting application documents "was work assigned by my supervisor. for example, I was responsible for writing application documents for certain students." EDU Overseas' management issued the instruction to ghostwrite Application Documents: "I was assigned by my boss to write application documents for my assigned student." Nor was **FE 20** alone: "My Document Specialist colleagues were all asked to write application documents, ***our job responsibilities are the same***."

104. FE 14, a mere intern in EDU Overseas' Shanghai office, pointed out that "interns pretty much do whatever we were asked," including in FE 14's case ghostwriting Application Documents. FE 15, a senior Document Specialist in Nanchang with managerial responsibilities including hiring other Document Specialists, reported that "when writing documents, we discussed with the students, and then the Document Specialists wrote the documents," referring to Application Documents. FE 15 added that when evaluating applicants, FE 15 "considered their English level, many Documents Specialists were English majors." According to FE 15, because ghostwriting Application Documents was Document Specialists' job, the level of their written English was their most important qualification.

105. According to **FE 16, FE 16** did not initially have primary responsibility for any students due to lack of ghostwriting experience prior to joining EDU Overseas. It was only after improving **FE 16's** ghostwriting (by practicing ghostwriting for other Document Specialists) that **FE 16** received student accounts. FE 17, likewise, had little experience ghostwriting documents. FE 17 was thus not allowed to be the account Document Specialists for clients applying to Australia or UK universities, as those countries placed a higher value on the quality of the

applicant's English. EDU Overseas informally outsourced ghostwriting to **FE 18** even before **FE 18** took up a position there. **FE 18** explained, "I formally joined EDU Overseas ***to write documents***," referencing Application Documents.

106. Similarly, *FE 1*, *FE 4*, FE 6, and FE 10, who all worked in EDU Overseas' offices in Beijing, Zhengzhou, and Wuhan as Document Specialists, each reported that ghostwriting documents was their most important job responsibility. **FE 3**, though not a Document Specialist, interacted with them, including by helping Document Specialists invent "telling" personal anecdotes for their clients' personal statements when the information the students provided in their intake questionnaires and intake meeting was too dull or unimpressive. **FE 3** further reports that Document Specialists ghostwrote all relevant documents. The former employees' statements mentioned in ¶¶93-113, who collectively worked at EDU Overseas' Beijing, Kunming, Zhengzhou, Wuhan, Changsha, Taiyuan, Hefei, and Shanghai offices, among others, show that ghostwriting all Application Documents was standard operating procedure throughout EDU Overseas' operations.

107. **FE 13** was told at **FE 13's** interview that the job would be ghostwriting. **FE 13** stated:

> I remember the interview I had before joining; it included a writing test and it was quite difficult. I was asked to compose a short essay within limited time based on a given topic. ***Generally, I remember being told that English writing skills are essential for this position because the daily work is to write documents. Yes, and then after joining EDU my responsibility was to write documents.***

108. Likewise, FE 14 explained that at FE 14's job interview, "I got questions over my English writing skills during the interview and was told that I might be asked to help in English writing. Interns pretty much do whatever we were asked, ***and this included writing documents***."

109. **FE 21** knew the job would be to ghostwrite even before the interview:

> How did I learn my job was to write documents? ***I knew when I applied for the job. When they were recruiting, I knew they were recruiting those who can write English documents and write application documents for students.*** I am quite confident about my English writing and decided to work in this position.

110. **FE 22**, likewise, understood that the job would be to ghostwrite application documents, explaining that "it was written on the recruitment ad that the recruited position was to write students' Application Documents."

111. **FE 20** learned the job was ghostwriting on day one:

> ***When I had my job interview, there was an English test***, and I remember there was an English writing topic, not the type of translating. I passed that, and so ***when I started to work as a later stage Document Specialist, my job responsibility was to write documents for the students.***

112. **FE 19** also knew the job was ghostwriting from **FE 19**'s first day. ¶48.

113. **FE 27**, likewise, was puzzled to be asked whether EDU Overseas' customers wrote their own Application Documents, stating that "during my tenure at EDU Overseas, I did not experience a situation where we required the student to write application documents." In fact, **FE 27** was skeptical that EDU Overseas could stay in business if it required students to do their own work:

> If the students write the application document by themselves, in fact everyone has their own way of thinking, and their writing skills are very different one from the other; ***if the document specialist makes editions and polishing subsequently, it is difficult to guarantee quality, and the editing itself will be quite difficult***. I don't think this is a viable way. ***Of course, I never experienced such model [asking the student to write application document] and I am just guessing that it couldn't work.***

**EDU Overseas Used Internal Templates to Ghostwrite Documents**

114. As set out in ¶¶115-122, EDU Overseas used internal templates to ghostwrite application documents.

115. **FE 13** explained that EDU Overseas' Document Specialists used internal templates – "some previous successful application documents which serve as examples" – to draft Application Documents. **FE 13** added that "We don't have to send the templates to the students ***as they are not responsible for writing the documents***."

116. Templates were crucial to EDU Overseas, especially for EDU Overseas document specialists with poorer writing skills. Citing poor English writing skills, FE 17 admitted to invariably adapting existing templates to new students' applications.

117. But as FE 6 explained, EDU Overseas is a volume business which does not offer "bespoke" ghostwriting. FE 6 had to ghostwrite so many Application Documents that FE 6 simply took templates and modified them slightly for each student, stating that other Document Specialists did the same. FE 6 made clear that the Application Documents EDU Overseas ghostwrote for its students were "standardized" – among other things, because the students did not bring their own individual writing styles to the Application Documents.

118. EDU Overseas employees could obtain templates from its internal servers. According to **FE 25**, EDU Overseas has "an internal server" and "after every application season, all Application Documents like resumes and personal statements would be uploaded to the EDU Overseas internal server." According to **FE 25**, "***[i]t is an internal policy*** that we must upload and archive all [application documents]." And, **FE 25** adds, while **FE 25**'s manager's approval of Application Documents was not necessary, "at the end, all these materials are uploaded to the shared server for archiving." **FE 26** confirmed **FE 25**'s account, stating that "all finished application documents are required to be uploaded to the EDU Overseas internal server."

119. Indeed, online, EDU Overseas customers complained that the Company relied too much on templates. On June 3, 2019, a review of EDU Overseas was posted on Zhihu, a

Chinese website similar to Quora, providing that "[b]ecause this is a big institution which signs contracts with a large number of students, and it works on a batch-application model, its documents rely highly on templates and lack custom-made personalization."[12] On December 26, 2018, another customer panned EDU Overseas, claiming that "Some 'senior' consultants even pieced out a new main document using other students' documents."[13] And a May 29, 2019 publication reviewing EDU Overseas' services gave it poor reviews, as "EDU [Overseas], quality of documents: quite a lot of grammatical errors and come in similar forms, the content is dull and stiff. Some customers noted that its documents appear to be made from templates and lack originality."[14]

120. Further, as set out in ¶137 below, the Application Contracts grants EDU Overseas – and not the students – the intellectual property rights to the Application Documents its employees ghostwrite, thus allowing EDU Overseas to reuse these documents as templates.

121. Like all writers, students bring their own individual writing and organizational styles, and life experiences, to personal statements and essays they themselves write. That Application Documents passed off as EDU Overseas' customers' bear EDU Overseas' house structure and style shows that the students were not writing their own Application Documents, but instead that EDU Overseas was ghostwriting them.

122. Absurdly, by customarily using templates, EDU Overseas exposed students to the risk that universities would find that the students plagiarized ***other Application Documents EDU***

---

12 A response to the question: "Peking University student to study in Britain, should I choose New Oriental EDU or Premium Education", Anonymous, 6/3/2019, Available at https://www.zhihu.com/question/59417167/answer/704033956
13 a response to the question: "Is New Oriental EDU a good intermediary?", Anonymous, 8/3/2019, available at https://www.zhihu.com/question/22196307
14 "Baidu Data Summary: Ranking of Overseas Study Intermediaries in Beijing", Xiren Education Network, 5/29/2019, available at https://www.olsite.com/fExccKWZ.html

***Overseas had drafted and submitted for other students***. FE 11 and **FE 26** report that to address this risk, EDU Overseas used a firm-wide anti-plagiarism software similar to Turnitin on ghostwritten documents. According to FE 11 and **FE 26**, the purpose of using this anti-plagiarism software was to check that the ghostwritten materials were sufficiently "original" – i.e. different enough from other materials EDU Overseas submitted on behalf of other students. According to FE 11 and **FE 26**, EDU Overseas thereby concealed from universities' own anti-plagiarism software that the Application Documents were ghostwritten. Similarly, *FE 1* and *FE 4* both reported that EDU Overseas instructed its Document Specialists to personalize the ghostwritten Application Documents to prevent universities from discovering that they were ghostwritten.

**EDU Overseas Customers Did Not Comment on "Their" Application Documents**

123. FE 5's job was selling EDU Overseas' services to potential clients. FE 5 explained that ghostwriting personal statements, recommendation letters, and other Application Documents was EDU Overseas' standard service. Thus, when he pitched EDU Overseas' services, FE 5 made sure to emphasize that EDU Overseas provided "all-inclusive" services which, as FE 5 explained, meant that EDU Overseas would ghostwrite Application Documents and interact with universities on the student's behalf. **FE 13** explained the logic of FE 5's sales pitch: "[s]tudents came to us because we offer full package service, why would we ask the students to write documents?"

124. **FE 13** reports that "after finishing the documents, we send them to the students for them to review, to see if they are satisfied with our writing." Likewise, FE 10 explained that in EDU Overseas' Wuhan office, Document Specialists would ***first*** ghostwrite all Application Documents ***and then*** solicit comments from the student. According to *FE 4*, the students very

rarely had any questions. *FE 4* reports that only 30% of students – the top students – ever even asked questions about or commented on the Application Documents. According to *FE 4*, most students did not have good enough English to provide any input. *FE 1* similarly reports that only "top students particularly concerned about their application may take time to read the [Application] documents themselves and give feedback." *FE 1*, exactly like *FE 4*, estimated that only 30% of students commented on their Application Documents. Instead, *FE 1* notes, the remainder asked few, if any, questions. *FE 1*, *FE 4*, and FE 10's experiences were entirely typical. **FE 22** bragged that "the students I serviced were all quite satisfied with my writing, and didn't ask me to revise much." Indeed, **FE 22** continues, "many of them were satisfied with the first draft." More cynically, **FE 24** claimed that EDU Overseas' customers were not skilled enough to detect flaws in EDU Overseas' work product. **FE 24** noted that EDU Overseas' customers "didn't know much" and "didn't have high skills." and "can't write quality application documents," and "that's why they seek" a company like EDU Overseas, because EDU Overseas "write[s] better application documents." But **FE 24** also remarked that students could not evaluate the quality of their ghostwritten application documents: "their [the students'] skills weren't good and they were not able to figure out what is quality writing." So, **FE 24** adds, "essentially it's all about the way you talk, not about the quality of an application document itself." **FE 24** explains further that because they do not read the Application Documents and "are very gullible," "many students don't even read the application documents, many will just submit them." As a result, **FE 24** criticized his colleagues for the poor quality of their ghostwritten Application Documents: "some of the application documents my colleagues wrote I found to be of low quality and contained grammatical mistakes."

125. Likewise, a student complained on Weibo (a Chinese social media site one of whose functions is similar to Twitter) on August 28, 2015 that "I can't believe I am picking grammar and wording mistakes made by the EDU Overseas document specialist, sentence by sentence. Could you have made a more ridiculous mistake? I checked two paragraphs and there are mistakes in all sentences. Could you be even more inattentive? You used the word performance as a verb, and the sentences are either unfinished or broken. Am I supposed to check up your English level?"[15] And on April 18, 2019, another student posted screenshots of chat logs between the student and a Document Specialist to substantiate the complaint she published on Weibo, including one in which the Document Specialist asks the student: "Do you have time to take a look at the documents? If you have no problems with it, we can do the proof-reading later, and then submit it."[16]

126. In some cases, the customers admitted that they did not even look at the Application Documents. On January 10, 2019, a customer complained on Weibo that:

> I don't know a lot about applying nor how to write a personal statement. Therefore, I just filled out the questionnaire they asked me to and left it aside. In less than a week, I got rejected by my guaranteed school. I looked at my documents, which included nothing about my exchange programs or competition courses. The entire document is purely boilerplate language.[17]

**EDU Overseas Trained Document Specialists To Ghostwrite and Recognized Top Ghostwriters Through Its Golden Document Specialist Award**

---

[15] Iris Jiejie, 8/28/2015, available at, https://www.weibo.com/1766178383/CxY6RmQO6?type=comment

[16] Biu Ya, 4/18/2019, available at, https://www.weibo.com/6322947883/HqcyIuCJp?type=comment#_rnd1565643806721

[17] Intermediary to Come Out For A Beat-Up Bot, 1/10/2019, available at https://www.weibo.com/6026802155/HbjMHtEYr?refer_flag=1001030103_&type=comment#_rnd1566249114397

127. As set out in ¶¶128-131, EDU Overseas trained its Document Specialists in ghostwriting.

128. FE 11 reports that when Document Specialists were first hired, EDU Overseas trained them in ghostwriting. This training was not cursory – in fact, FE 11 reports that EDU Overseas flew the new hires to its Beijing headquarters for the ghostwriting training session. FE 8 reports that EDU Overseas also held regular ghostwriting training sessions for its Document Specialists. **FE 25**, likewise, reports that when **FE 25** started, **FE 25**'s office's director "will hold some simple training lessons, talking about writing techniques and case studies." **FE 26** also reported on "small training sessions at the local subsidiary level," noting that the "office director analyzed the structure of the application documents, telling us how to write, and showing us some same application documents considered to be outstanding." According to **FE 26**, "during the training, they told us that the [outstanding] application documents were written by Consultant XYZ at EDU Overseas." When **FE 25** started work at EDU Overseas, he says, "I would go on the EDU Overseas [] internal server" to find Application Documents "and learnt how to write." **FE 25**'s "team leader" encouraged **FE 25** to consult previous work as he "sent [**FE 25** and other team members] some sample Application Documents."

129. FE 6 reports that EDU Overseas also subjected Document Specialists to periodic tests to assess the quality of their ghostwriting. And *FE 4* reports that managers frequently reviewed and evaluated the Document Specialists' ghostwritten essays. **FE 26** remembers "internal guidelines" which provided that EDU Overseas' Beijing "headquarters will conduct spot inspection of documents from the internal server to ensure quality."

130. FE 8 explains that EDU Overseas presented awards recognizing excellence in ghostwriting. FE 11 and **FE 26** concur that EDU Overseas gave out firm-wide awards

recognizing top employee performers in various categories, and add that the awards for best Document Specialists were titled the "Golden Document Specialist."[18] FE 11 explains that the award was based on the quality of the recipient's ghostwriting of Application Documents. According to FE 11, the purpose of the Golden Document Specialist award was to recognize outstanding ghostwriting. And FE 11 recalls that firmwide emails were sent announcing the winners of the Golden Document Specialists awards. Likewise, FE 11 recalls that EDU Overseas' Beijing office organized special in-person events to reward all award recipients, flying all recipients to the location of the special event. And **FE 26** remembers that the Golden Document Specialists were typically awarded to Document Specialists who wrote Application Documents that got students into top schools.

131. **FE 18** received the Golden Document Specialist award which, he bragged, recognized his superior ghostwriting skills:

> Yes, I was awarded [Golden Document Specialist] ***because my writing quality was better***. It was decided by the managers based on factors such as whether I can write quickly and with good quality. This means they appreciated my writing skills.
>
> Writing quality means the quality of the documents ***I write, which includes personal statements and resumes***, but usually in fact personal statement is the most important. ***You have to be experienced to know how to write good quality personal statement.***

**EDU Overseas' Form Contracts Provide for Ghostwriting**

132. As set out in ¶¶132-137, EDU Overseas' own contracts show that it ghostwrote documents. *FE 9* supplied an EDU Overseas contract to apply to French universities ("Application Contract").[19] The Application Contract Plaintiffs obtained is plainly a standardized contract. It includes a price list, and instructs the customer to place a mark next to the product

---

[18] In Chinese characters, 金牌文书.

[19] The Application Contract is attached as Exhibit 2-A to this Complaint, and its translation as Exhibit 2-B. Both are incorporated by reference.

the applicant seeks. The Application Contract also allows customers to select desired admissions, which EDU Overseas will then obtain. For example, if an applicant wants to be admitted into a top 5 business school in France, he or she should select Contract France-A-1 and Document A-1, which costs RMB 25,000 (approximately $3,500) with ghost-written documents included. Should EDU Overseas fail to secure admission, all but RMB 3,000 will be refunded. Ex 2-B, at 3.

133. According to *FE 9*, the Application Contract for U.S. schools is substantially identical, except for price and university differences. According to *FE 9*, EDU Overseas' contracts always include a price list with application document preparation clearly listed as one of the services provided.

134. Article 16 of the Application Contract provides "When the applicant signs this contract with [EDU] Overseas, the applicant shall pay the admission and application services fee and visa services fee to [EDU] Overseas. The fee details and relevant deductions are described as follows. Please place a check in the 'confirmed selection.' (All currency units below are in Renminbi)." Article 16 then provides a price list for "documents" which it defines to "include[]: (one personal resume, one statement of motivation, PASTEL system services follow-up.)"

135. Plaintiffs showed the Application Contract to two Former Employees who confirmed that the charge for document preparation was to ghostwrite Application Documents:

a. **FE 13** stated that reference in Article 16 to "preparing documents" meant "writing documents on behalf of the students is part of the charged services."

b. **FE 16** stated that the prices in Article 16 are "the price for preparation of documents," adding that "this means we will write on behalf of the student."

136. Indeed, the Application Contract's Article 20 provides:

> **Article 20. If for reasons attributable to the applicant, the applicant seeks to revoke the contract after the contract is signed, the intermediary service fees already paid by the applicant shall be handled in the following manner:**
> […]
> 2. After 7 days from signing the contract with Vision Overseas (with the signing date being day 1), ***[EDU] Overseas begins to produce documentary materials based on the application materials provided by the applicant.***

137. Moreover, the Application Contract's Article 12 also provides that EDU Overseas maintains the right to publicize and re-use the documents it "assisted the student in drafting,"[20] seemingly a reference to using these documents as templates.

138. Likewise, in certain Chinese-language publications aimed at Chinese students or Chinese job applicants, EDU Overseas admitted that it ghostwrote documents for students.

a. EDU Overseas' own Chinese-language website lists a case study in which EDU Overseas "communicated with the kid and made quick target school choices and our ***document specialist worked overtime to write the documents*** and submit applications for the kid."[21]

b. An EDU Overseas account titled Shanghai EDU Vision Overseas Study posted on an advertisement on Zhiho.com, a Chinese Q&A website similar to Quora, stating that "EDU Vision offers a wide range of services including test mentoring, overseas study planning, university and college application, scholarship application, document writing, interview training, visa training,

---

[20] FE 7 noted that EDU Overseas commonly used expressions like "assisted students to compose" documents in contracts as euphemisms for ghost-writing.

[21] "How to take immediate actions when you failed via DIY", Ms. Li Wang, manager of US Studies, available at http://liuxue.xdf.cn/blog/wangli75/case/726471.shtml

and international study trips. This offers the student relaxed 'one stop' services."[22]

c. EDU Overseas posted an online advertisement seeking to recruit a Document Specialist for its Guangzhou office. The detailed job description includes the following: "Understanding the client's relevant background information regarding his/her overseas study application, ***conducting English document planning and writing***."[23]

139. And in a public resume, an EDU Overseas Document Specialist describes her job at New Oriental as to "write, translate, and polish the student's document materials and related overseas study documents." Another EDU Overseas Document Specialist's public resume claims that her job included "the writing of the student's documents including resume, reference letter, and personal statement."

**The Cost of EDU Overseas' Services Makes No Sense If All It Provides are Consulting Services**

140. In the U.S., admissions package deals on average cost $3,600.[24]

141. The Former Employees provided consistent estimates of the prices EDU Overseas charges its customers for applications. *FE 1*, who worked in Beijing, estimated that EDU Overseas charged approximately RMB35,000-40,000 ($5,500). *FE 4*, who worked in Zhengzhou

---

[22]Shanghai EDU "New Oriental EDU a good intermediary?", Shanghai EDU, 10/30/2017, available at https://zhuanlan.zhihu.com/p/30577038

[23] EDU Overseas Guangzhou, job posting, July 24, 2018, available at https://www.douban.com/group/topic/120855624/

[24] Emily Driscoll, Thinking of Hiring a College Consultant? Here's What to Expect, Fox Business May 13, 2011, available at https://www.foxbusiness.com/features/thinking-of-hiring-a-college-consultant-heres-what-to-expect

(a city with a lower cost of living than Beijing), estimated that EDU Overseas charged approximately RMB 30,000 ($5,000).[25]

142. EDU Overseas typically employs recent university graduates, and even interns. EDU Overseas' employees work in China, which has a much lower cost of living than the U.S. Thus, the services should cost less, not more, in China.

143. But EDU Overseas charge more than U.S. admissions counselors because it provides different services: it ghostwrites entire applications.

***EDU Overseas Created Email Accounts and Impersonated the Student While Corresponding With Universities***

144. Students who simply themselves applied with ghostwritten Application Documents risked that universities would discover the ghostwriting. First, the quality of the students' written English in their email correspondence will not match the quality of the student's ghostwritten Application Documents. And second, EDU Overseas' customers are, after all, high school students, and risked hurting their chances by sending inappropriate emails to admissions officers.

145. To address this risk, as *FE 1*, **FE 2**, **FE 3**, *FE 4*, FE 5, FE 6, *FE 9*, FE 10, and **FE 13** explained, the "full services" EDU Overseas provided included acting as the student's unacknowledged intermediary with the university. As these same former employees noted, EDU Overseas promised students that beyond the intake meetings and intake questionnaires, they would not have to work on "their" application.

[25] The Application Contract's prices are for application documents to French universities, which are not necessarily the same as application documents for U.S. universities. Nevertheless, the Application Contract's fees are lower but of the same magnitude as fees to apply to U.S. universities.

146. According to **FE 13**, EDU Overseas created "application email accounts" which are "separate" from the students' own email accounts. EDU Overseas employees throughout the EDU Overseas' offices reported exactly the same account. Early Stage consultants **FE 2**, **FE 3,** *FE 9*, and FE 10, employed respectively in EDU Overseas' Guangzhou, Kunming, Qingdao, and Wuhan offices, reported that they personally: (a) created email application accounts; (b) did not give the student access to the email application account or give the student login credentials; and (c) impersonated the student in communications with the universities. Each reported that these precise steps were standard operating procedures in each of their offices. Other employees *FE 4*, FE 5, and FE 6, employed in EDU Overseas' Zhengzhou office, though not Early Stage Consultants, confirmed that in their office, the Early Stage Consultants all: (a) created email application accounts; (b) did not give the student access to the email application account or give the student login credentials; and (c) impersonated the student in communications with the universities. According to *FE 1*, **FE 2**, **FE 3**, *FE 4*, and FE 5, EDU Overseas would also set up online accounts to apply to the universities in the student's name.

147. The practices' wide adoption as standard operating procedures throughout EDU Overseas offices leaves no doubt that they were EDU Overseas' policies, rather than the individual acts of Early Stage Consultants. Indeed, **FE 3** also reported that whenever a student sought access to the email account, **FE 3** would point to EDU Overseas' policy prohibiting its employees from giving access to "their" email addresses.

148. Early Stage Consultants would use the student's lack of access to their advantage. According to FE 6 and FE 10, during application seasons, busy Early Stage Consultants would falsely tell students their applications had been submitted or correspondence had been sent to the

schools. Because the students had no access to their own applications, they had no way to tell that the Early-Stage Consultants were lying.

149. Moreover, the December 2, 2016 *Reuters* article reported that the authors had obtained a copy of an executed contract between EDU Overseas and one of its clients. According to the *Reuters* journalists, the contract contained a clause providing that EDU Overseas would create an email address to which the student did not have access and would use it to correspond with the universities.

150. The Application Contract includes provisions similar to the *Reuters* article's contract:

> **Article 14.** [EDU Overseas] agrees and confirms that [EDU Overseas] has the right to open and process any letters (including but not limited to postal mail, email, or fax) sent to the applicant by universities to which the applicant has applied or not.

151. Similarly, the Application Contract provides:

> **Article 19.** In order to ensure that the application materials quickly and safely arrive at the foreign university, all mail correspondence between the applicant and the university shall utilize services of international large express delivery companies. The delivery fees shall be paid by the applicant at the rate of RMB 150/instance per university in accordance with DHL rules.

152. In 2015, the year of the contract, the cheapest possible rate for individuals to send a DHL package from China to France was RMB 273, almost twice as much as the rate EDU Overseas charged students. Thus, Article 19 provides that the student will ***reimburse*** the costs that EDU Overseas incurs in mailing the student's package.

153. The Application Contract likewise provides under Article 20:

> 3. Once the applicant signs the contract with [EDU] Overseas, and ***[EDU] Overseas has completed online applications or has submitted application materials to the universities applied for***, if the applicant initiates the termination proceedings, then 80% of the admission application services fee collected by [EDU] Overseas shall be deducted while the balance shall be refunded, and the contract shall terminate.

154. Thus, the Application Contract provides that EDU Overseas will correspond with the universities.

***Management Knew of the Ghostwriting***

155. Ghostwriting was not the work of a few bad apples who circumvented EDU Overseas' policies. Instead, ghostwriting was EDU Overseas' policy. Ghostwriting was reflected in Document Specialists' firmwide job responsibilities, see ¶¶29-55, in form contracts, see ¶¶132-37, in the use of firmwide practices to solicit information from students, ¶¶87-93, in the firmwide practice of impersonating students, ¶¶145-153, in firmwide training teaching and awards rewarding ghostwriting, ¶¶128-131, in the practice of uploading all ghostwritten documents to the internal server, ¶¶128-129, and in the practice of using antiplagiarism software to avoid detection. ¶96. Indeed, **FE 13** could not understand why anyone would think that EDU Overseas would be fired for ghostwriting: it is their job. ¶96. The following map shows the location of the offices that Plaintiffs have been able to confirm engaged in academic fraud as standard operating procedures:




*Source: EDU Overseas website. Red dots are EDU Overseas offices whose Former Employees confirmed to Plaintiffs were ghostwriting offices. Green dots are all other EDU Overseas as of the filing of this Complaint. Not all offices shown on the map existed during the Class Period.*

156. In this context, the former employees agreed that it was impossible for management, including EDU Overseas' longtime leader Defendant Zhou, not to know that EDU Overseas engaged in rampant ghostwriting. According to *FE 4*, it is "difficult to imagine" management was not aware of the practice of ghost-writing, as it is a "vital part" of the services EDU Overseas promised to provide. Indeed, *FE 4* continued that ghost-writing is one of the most important factors attracting students to EDU Overseas. According to **FE 3**, it is "quite impossible" for management not to have known of the ghost writing. FE 6 scoffed at the idea that management might not have known of the ghost-writing, as "of course management knew."

157. These former employees are not reporting hearsay; they are, instead, bemused that anyone would question whether EDU Overseas' management knew ***what kind of business EDU Overseas is***.

158. Moreover, Zhou was personally exposed to ghostwriting. FE 7 reports that Document Specialists in the Beijing Office in which Zhou worked ghostwrote personal statements and recommendation letters. FE 7 added that in that office, as elsewhere, ghostwriting was Document Specialists' primary responsibilities. FE 7 denied that there had been any efforts to "curb[] the ghostwriting" during his tenure. At best, EDU Overseas deployed euphemisms, like "polishing" or "helping to prepare" documents, but the "essential nature" of the Document Specialists' job remained ghostwriting. Thus, EDU Overseas' policy in the very office in which Zhou worked was to ghostwrite Application Documents.

***EDU Overseas' Consultants Continued Ghostwriting After the* Reuters *Article***

159. Many of the Former Employees who were employed during the Class and who reported that ghostwriting was standard operating procedure at EDU Overseas, such as **FE 12**, **FE 13**, **FE 16**, **FE 18**, **FE 19**, **FE 21**, **FE 22**, **FE 25**, and **FE 27**, continued to work for EDU Overseas for months or years after the Class Period. Likewise, four employees who reported that ghostwriting was standard operating procedure, FE 14, FE 15, FE 17, and **FE 21**, began work at EDU Overseas after the close of the Class Period. Further, 5 of the customer complaints and articles cited in this Complaint were made after the close of the Class Period. ¶¶119, 125, 126.

160. Thus, it is clear that EDU Overseas made no attempt to curtail ghostwriting in the wake of the *Reuters* article. EDU Overseas had no interest in doing so because ghostwriting is its business.

***EDU Overseas' Customers Were Not Prepared for University.***

161. EDU Overseas did its customers no favors.

162. Most EDU Overseas' customers sought ghostwriting because their English was poor and they could not complete Application Documents.

163. Yet when those ghostwritten documents secured admission, the students attended schools where their classes, exams, and papers were in English.

164. As a result, the students were unprepared for university. For example, a University of Arizona professor reported that in 2014, all 20 of her Chinese students failed her introductory Russian history class.[26] 25% of Chinese students dropped out of Ivy League universities,[27] against a general graduation rate of 95%.[28]

165. Other students are forced to continue to hire ghostwriters to write their papers and assignments. These students earned far less from their education and, moreover, risked being discovered and expelled. In fact, 8,000 Chinese students were expelled from U.S. universities in 2015, about 80% of them for poor grades or academic dishonesty.[29]

166. Thus, the Chinese students EDU Overseas "assisted" struggled in university.

***Defendants' False and Misleading Class Period Statements***

167. On September 2, 2016, Zhou was promoted to CEO of New Oriental.

---

[26] Adele Barker, Are Chinese Students Driving Educational Imperialism?, Inside Higher Ed, October 19, 2015, available at https://www.insidehighered.com/views/2015/10/19/professors-experience-unprepared-chinese-students-essay

27 Chris Luo, Study: One in four Chinese students drop out of Ivy League Schools, South China Morning Post October 29, 2013, available at https://www.scmp.com/news/china-insider/article/1342846/study-one-four-chinese-students-drop-out-ivy-league-schools

28 David Schessler, The Ethics of Admissions Consultancies Serving China, February 2019, at 19, available at https://www.researchgate.net/publication/332832446_The_Ethics_of_Admissions_Consultancies_Serving_China, at 19.

29 Liyan Qi, U.S. Schools Expelled 8,000 Chinese Students, Wall Street Journal Blog May 29, 2015, available at https://blogs.wsj.com/chinarealtime/2015/05/29/u-s-schools-expelled-8000-chinese-students-for-poor-grades-cheating/

168. On September 27, 2016, New Oriental filed its annual report on Form 20-F for the fiscal year ended May 31, 2016 (the "2016 20-F") with the SEC. Zhou was the sole signatory to the 2016 20-F. Zhou also separately certified the 2016 20-F pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by stating that:

> 1. I have reviewed this annual report on Form 20-F of New Oriental Education & Technology Group Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

169. The 2016 20-F misstated EDU Overseas' role and function. First, the 2016 20-F repeatedly and invariably referred to EDU Overseas as New Oriental's "overseas studies consulting business." Second, the 2016 20-F repeatedly and invariably represented that the income EDU Overseas generated was "consulting" income.

170. Defendants' statements were misleading because the services provided by EDU Overseas were not "consulting" services. EDU Overseas met the student briefly and had the student answer an intake questionnaire. From then on, EDU Overseas stepped into the student's shoes, taking control of all correspondence with the universities and by ghostwriting all Application Documents. The students' participation in their applications was limited to approving the final Application Documents and, in some cases, providing comments on the Application Documents. Accordingly, Defendants' statements that EDU Overseas provided "consulting" services were false because EDU Overseas did not "consult" with the students but instead did all the work for the student.

171. The 2016 20-F misstated EDU Overseas' operations:

> *Overseas Studies* ***Consulting***. Our consultants ***help students through*** the application and admission process for overseas educational institutions and provide useful college, graduate and career counseling advice to help students make informed decisions. We also counsel students with the immigration process for overseas studies, such as obtaining visas and housing. We charge each student a fee based on the scope of consulting services requested by the student.

172. Under header "ITEM 5. OPERATING AND FINANCIAL REVIEW AND PROSPECTS […] A. Operating Results," the 2016 20-F provides, in relevant part, in the midst of information about New Oriental's operations in the year ended May 31, 2016:

> We also provide ***consulting services*** to students regarding overseas studies and related processes, such as visa applications. We charge each student a fee based on the scope of ***consulting services*** requested by the student and recognize revenues when our ***consulting services*** are delivered. We expect that revenues from these consulting services will continue to increase in the future.

(Emphasis added)

173. In fact, the services provided by EDU Overseas were not "consulting" services. EDU Overseas met the student briefly and had the student answer an intake questionnaire. From then on, EDU Overseas stepped into the student's shoes by taking control of all correspondence with the universities and by ghostwriting all Application Documents. The students' participation in their applications was limited to approving the final Application Documents and, in some cases, providing comments on the Application Documents. Accordingly, Defendants' statements that EDU Overseas provided "consulting" services or "help[ed]" students were false because EDU Overseas did not "consult" with or "help" the students but instead did all the work for the student.

174. Moreover, by claiming that EDU Overseas' revenues would increase, Defendants emphasized that the business would become more material to New Oriental over time.

175. The 2016 20-F provided that:

> ***We are required to obtain various operating licenses and permits and to make registrations and filings for our business operations in China; failure to comply***

> ***with these requirements may materially adversely affect our business and results of operations.***
>
> We are required to obtain and maintain various licenses and permits and fulfill registration and filing requirements in order to conduct and operate our business. For instance, to establish and operate a school to provide language training and test preparation services, we are required to obtain a private school operating permit and to make necessary filings for each learning center with the local counterparts of the Ministry of Education and the Ministry of Civil Affairs. Our business is also subject to various health, safety and other regulations that affect various aspects of our business in the cities in which we operate and we must obtain various licenses and permits under these regulations for our operations. ***We have been making efforts to ensure compliance with applicable rules and regulations in all material respects.***
>
> (Second emphasis added)

176. The 2016 20-F set out an example of such regulation:

> **Regulation**
>
> This section summarizes the principal [Chinese] regulations relating to our business.
>
> * * *
>
> [T]he Education Commission of Beijing and Beijing Administration for Industry and Commerce jointly issued the Beijing Measures of Supervisions and Recognition of Intermediate Services for Self-Funded Overseas Studies (Trial) on September 30, 2015, which require that any intermediate service organization engaged in such services in Beijing shall satisfy certain requirements set up therein. . . . The intermediate service organizations ***which satisfy such requirements*** may apply with the Education Commission of for [sic] the Recognition on the Intermediate Service Organization for Self-funded Overseas Studies.
>
> * * *
>
> [EDU Overseas], a subsidiary of New Oriental China engaging in overseas studies consulting and other consulting services, has obtained the relevant licenses from the MOE and the Beijing Municipal Public Security Bureau.

177. Thus, Defendants' statements provided that only organizations satisfying the Beijing Measures of Supervisions and Recognition of Intermediate Services for Self-Funded Overseas Studies (Trial) (the "Beijing Measures") may apply for a license. Defendants

represented that because EDU Overseas had applied for and obtained a license, it materially complied with the Beijing Measures, among others.

178. But Article 13 of the Beijing Measures provides, in relevant part, that the agency "shall not fabricate and provide fake materials to the person that the agency provides services to, or direct, assist or cause the person that the agency provides services to provide fake materials or to fabricate pertinent materials to go overseas for self-funded studies." Rather, as provided in Article 12, the agency "may . . . guid[e] admission application into certain foreign schools, provide authentic and truthful documents and materials."

179. Not only did EDU Overseas not comply with the Beijing Measures, it did not and could not "mak[e] efforts to ensure [material] compliance" with all rules and regulations. EDU Overseas' business was to provide full-service applications to students unable or unwilling to complete their own applications. EDU Overseas met the student briefly and had the student answer an intake questionnaire. From then on, EDU Overseas stepped into the student's shoes by taking control of all correspondence with the universities and by ghostwriting all Application Documents. The students' participation in their applications was limited to approving the final Application Documents and, in some cases, providing comments on the Application Documents. EDU Overseas could not comply with the Beijing Measures, and could not even try to, without overhauling its business model, finding different kinds of customers, and overhauling its employees to find staff with different skill sets. Thus, EDU Overseas did not, and could not, "mak[e] efforts to ensure [material] compliance."

180. During the entirety of the Class Period, New Oriental's English-language website described EDU Overseas' business as international "consulting":

> **Int'l Study Consulting**
>
> Today, an increasing number of Chinese students are considering opportunities to study abroad. From consulting services to full-time intensive study, New Oriental offers a full suite of services to help students achieve – and get the most out of – their dream of international study.
>
> New Oriental's experienced overseas studies consultants ***work closely with students throughout the entire process of preparing to go abroad: from school selection and application***, to scholarship applications, to the visa and immigration process, to practical assistance such as locating student and off-campus housing. In addition, we offer a range of training programs to make sure students are best prepared to get the most out of their overseas experiences.
>
> (Emphasis added)

181. EDU Overseas did not "work closely" with students. EDU Overseas met the student briefly and had the student answer an intake questionnaire. From then on, EDU Overseas stepped into the student's shoes by taking control of all correspondence with the universities and by ghostwriting all Application Documents. The students' participation in their applications was limited to approving the final Application Documents and, in some cases, providing comments on the Application Documents. Thus, the statements were false because the students had little involvement with their own applications and did not work closely with EDU Overseas.

182. During the entirety of the Class Period, EDU Overseas' English-language website described EDU Overseas' benefits to Partners (i.e., universities to which students applied) as:

> Direct access to prospective students
> Since most New Oriental students start with our language training programs, we are able to track their record and performance history. [EDU Overseas'] partners can have access to these student profiles to help with recruitment and program.

183. In fact, EDU Overseas actively misled its partners about students' language abilities by ghost-writing personal statements, writing samples, and other writings attributed to the student.

***Loss causation***

184. On December 2, 2016, *Reuters* published a report alleging academic applications fraud at New Oriental.

185. Specifically, based on conversations with eight former and current EDU Overseas employees and review of a contract between EDU Overseas and one of its clients, *Reuters* reported that:

a. "Most [New Oriental] clients lacked the language skills to write their own essays or personal statements, so counselors wrote them; only the top students did original work." *FE 1* and *FE 4* reported the same thing.

b. "A New Oriental student contract reviewed by *Reuters* states that its services include 'writing or polishing' parts of college applications." The Application Contract included a charge for drafting documents.

c. "The contract says New Oriental will set up an email account on behalf of the client for communicating with colleges, keeping sole control of the password." The Application Contract provides that EDU Overseas would apply on behalf of the student, and would "open and process" any and all communications addressed to the student. Moreover, **FE 2**, **FE 3**, *FE 4*, FE 5, FE 6, *FE 9*, and FE 10 all reported that EDU Overseas would create email and applications accounts and would not provide the student with logon information.

d. According to *Reuters*, former EDU Overseas employee Olivia Qiu "wrote essays for students. Other employees, she said, wrote personal statements, supplemental essays and recommendation letters. 'Sometimes, the student didn't even see [the application] before they submitted it' to colleges."

Substantially all FE reported that EDU Overseas ghost-wrote essays, personal statements, and recommendation letters. Former employees and complaints likewise reported that many students did not see their Application Documents before they were submitted.

e. Former EDU Overseas employee Alan Li "said he would use material for essays from questionnaires the students completed but would invent stories if necessary." **FE 3** reported that if the experiences reported in the students' questionnaire answers were not sufficiently interesting, Document Specialists would invent stories.

186. Also on December 2, 2016, *Reuters* reported that the AIRC would investigate EDU Overseas in response to the *Reuters* report.

187. On this news, the price of New Oriental's ADSs fell $6.99 per share, or over 14% from its previous closing price, to close at $42.00 per share on December 2, 2016, damaging investors.

188. Zhou knew that the *Reuters* allegations were true, as they reported on policies he had himself implemented in his seven years as EDU Overseas' CEO. But Defendants still denied *Reuters*' allegation in both English and Chinese-language statements.

189. On December 3, 2016, New Oriental falsely denied the claims of the *Reuters* report in a Chinese-language press release:

> [EDU Overseas] has always prohibited any falsification. We discovered that the descriptions of so-called falsified documents in the *Reuters* article were essentially from former employees. We will not comment on the truthfulness of these employee statements. [EDU] Overseas has strict and definite stipulations in terms of operational procedures, employee training, and occupational conduct. The company has no tolerance for documentary fraud and takes falsified grades very seriously. This year, [EDU] Overseas has discovered two employees who conducted operations in violation of the rules, and turned them over to judicial

> authorities. ***Evidently, these actions were by individuals and cannot be equated to company actions.***

190. On December 5, 2016, New Oriental falsely denied the claims of the *Reuters* report in an English-language press release:

> New Oriental prides itself on its longstanding commitment to education and the high standards it has for itself as well as the students it assists with its programs. All of the Company's business operations, including those carried out by [EDU Overseas], are governed by robust policies and the Company has designed procedures to guard against any unendorsed behavior by employees. The Company does not condone the kinds of behavior described in the media reports, and has in the past enforced disciplinary actions against those employees who breached the Company's policies and procedures.

191. Then, on December 15, 2016, New Oriental CFO and the Company's IR Director held a conference call with Brean Capital and a group of investors. According to Brean's summary of the call:

> **Updates on academic fraud allegation.** Company highlighted that EDU's business operations are governed by strict policies and stringent procedures with disciplined controls of its employee behavior. While the investigation by American International Recruitment Council (AIRC) is pending, management currently expects a limited financial impact due to its limited exposure: the overseas consulting business contributed 8% of EDU's total revenue with U.S. contributing 50% of the consulting business revenue, of which AIRC is a part of.

192. Analysts were shocked by the news reported in the *Reuters* article. Analysts employed by Nomura, SWS Research, Credit Suisse, Deutsche Bank, HSBC, Jefferies, JP Morgan, Macquarie, and Barclays all issued special reports on or about December 5, 2016 commenting on the *Reuters* article and its potential ramifications.

193. Many of these analysts expressed great concern:

a. The Barclays analyst observed that the article had "resulted in damages to EDU's branding and reputation" and may result in EDU Overseas "no longer provid[ing] overseas consultancy services."

b. The JP Morgan analyst observed that "[w]e prefer TAL Education [a competitor] for less exposure to counselling services," and noted that "the reputational impact on EDU is difficult to determine especially if any findings prove to be a systemic fault of the company."

c. The Jefferies analyst observed that "the overall hit to New Oriental's brand name and any potential penalties may carry a much larger impact should the AIRC investigation find New Oriental to have engaged in systematic academic fraud."

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

194. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased or otherwise acquired New Oriental ADSs traded on the NYSE during the Class Period (the "Class"). Excluded from the Class are Defendants herein, current and former officers and directors of New Oriental, and members of their immediate families; any entity in which Defendants have or had a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

195. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, there were approximately 140 million New Oriental ADSs outstanding and actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class who are geographically dispersed. Record owners and other members of the Class may be identified from records maintained by New Oriental or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

196. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

197. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

198. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts or omitted to state material information about the business, operations, and management of New Oriental;

c. whether Defendants caused New Oriental to issue false and misleading financial statements during the Class Period;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the prices of New Oriental ADSs during the Class Period were artificially inflated because of Defendants' conduct complained of herein;

f. whether Defendants acted with the requisite level of scienter;

g. whether Zhou was a controlling person of the Company;

h. whether reliance may be presumed; and

i. whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, what is the proper measure of damages.

199. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

200. Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

201. In addition, Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory, because New Oriental's ADSs traded in an efficient market during the Class Period, as follows:

a. Throughout the Class Period, New Oriental's ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market, throughout the Class Period. ADSs were highly liquid during the Class Period, with an average daily volume of 980,063 ADSs;

b. As a regulated issuer, New Oriental filed periodic public reports with the SEC and the NYSE;

c. The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

d. The market reacted promptly to public information disseminated by the Company, as new, Company-specific information was rapidly reflected in the price of New Oriental's ADSs;

e. New Oriental's securities were covered by at least 21 securities analysts employed by major brokerage firms who wrote reports about the Company during the Class Period, including Bank of America Merrill Lynch, Credit Suisse (Hong Kong) Limited, Deutsche Bank, and Goldman Sachs & Co., and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

f. On average, 3.5% of New Oriental's ADSs were traded weekly, permitting a *very strong* presumption that its shares traded on an efficient market;

g. Seven specialist firms made a market in New Oriental's ADSs; and

h. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of New Oriental's ADSs.

202. Therefore, the market for New Oriental ADSs promptly digested current information regarding the Company from all publicly available sources and reflected such information in New Oriental's share price. Under these circumstances, all purchasers of New

Oriental ADSs during the Class Period suffered similar injury through their purchase of the Company's ADSs at artificially inflated prices and a presumption of reliance applies.

## FIRST CAUSE OF ACTION

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

203. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

204. This cause of action is asserted against all Defendants.

205. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other Class members to purchase New Oriental's ADSs at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

206. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of New Oriental as specified herein.

207. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of New Oriental's value, performance, and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary to make the statements made about New Oriental and its business operations and

financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of New Oriental ADSs during the Class Period.

208. Each of the Defendants' primary liability, and controlling person liability, arises from the following: (a) Zhou was a high-level executive, directors and/or agent at the Company during the Class Period and had control thereof; (b) by virtue of his responsibilities and activities as CEO of the Company, was privy to and participated in the creation, development, and reporting of the Company's plans, projections and/or reports; (c) Zhou enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports, and other data and information about the Company's, operations; and (d) Zhou was aware of the Company's dissemination of information to the investing public, which he knew or recklessly disregarded was materially false and misleading.

209. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing New Oriental's financial condition from the investing public and supporting the artificially inflated price of its ADSs. As demonstrated by Defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

210. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for New Oriental's ADSs was artificially inflated during the Class Period.

211. In ignorance of the fact that market prices of New Oriental's publicly-traded ADSs were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's ADSs trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired New Oriental's ADSs during the Class Period at artificially high prices and were damaged thereby.

212. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding New Oriental's financial results and condition, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired New Oriental ADSs, or, if they had acquired such ADSs during the Class Period, they would not have done so at the artificially inflated or distorted prices at which they did.

213. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

214. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's ADSs during the Class Period.

215. This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of ADSs giving rise to the cause of action.

## SECOND CAUSE OF ACTION

### Violation of Section 20(a) of the Exchange Act Against Zhou

216. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

217. This cause of action is asserted against Zhou.

218. Zhou acted as a controlling person of New Oriental within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level positions, agency, and his ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's dissemination of information to the investing public, Zhou had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. Zhou was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

219. In particular, Zhou had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Zhou, moreover, had ultimate authority over the Company's statements,

including controlling the content of such statements and whether and how to communicate such statements to the public.

220. As set forth above, New Oriental and Zhou each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

221. By virtue of his position as a controlling person, Zhou is liable pursuant to Section 20(a) of the Exchange Act as he culpably participated in the fraud alleged herein. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period.

222. This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of ADSs giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiffs as class representatives and Plaintiffs' counsel as Class Counsel;

b. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: August 19, 2019

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
/s/ Laurence M. Rosen
Laurence M. Rosen LR-5733
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
lrosen@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne (pro hac vice)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

**POMERANTZ LLP**
Jeremy A. Lieberman (not admitted)
Tamar A. Weinrib (pro hac vice)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: taweinrib@pomlaw.com

Co-Lead Counsel for Plaintiffs and Class

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of August, 2019, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Laurence M. Rosen

# APPENDIX A – EXAMPLES OF UNIVERSITY POLICIES PROHIBITING GHOSTWRITING

**Harvard University**

- *In keeping with the principle that all material submitted to a course should be the student's own work, any undergraduate who makes use of the services of a commercial tutoring school or term paper company is liable to disciplinary action. Students who sell lecture or reading notes, papers, or translations, or who are employed by a tutoring school or term paper company, are similarly liable and may be subject to disciplinary action, up to and including requirement to withdraw from the College. If a student wishes to accept compensation for private tutoring in Harvard courses, prior written permission of the Dean of the College is required.*
    a. title: 'Academic Integrity and Academic Dishonesty' – source - https://handbook.fas.harvard.edu/book/academic-integrity

**Princeton University**

- *All forms of academic fraud, including plagiarism, multiple submissions, false citation, and data falsification, are regarded as serious violations and will be subject to disciplinary action. Plagiarism in an ungraded draft paper, whether submitted to a professor as your original work or presented to a class, seminar, or workshop, is just as serious as plagiarism in a graded exercise.*
    a. title: 'Academic Integrity Contract' – source - http://jrv.mycpanel.princeton.edu/Academic_Integrity_Contract_2018.pdf
- *Observing basic honesty in one's work, words, ideas, and actions is a principle to which all members of the community are required to subscribe.*
    b. title: 'University-wide Regulations' sub-heading: 'Academic Integrity' – source - https://rrr.princeton.edu/university#comp11

**University of California at Berkeley**

- *Cheating is defined as fraud, deceit, or dishonesty in an academic assignment, or using or attempting to use materials, or assisting others in using materials that are prohibited or inappropriate in the context of the academic assignment in question, such as:*
  - *Allowing others to do an assignment or portion of an assignment for you, including the use of a commercial term-paper service.*

  a. title: 'Definitions & Examples of Academic Misconduct' – source - https://sa.berkeley.edu/conduct/integrity/definition

**Macquarie University**

- *Failure to act in accordance with commonly held acceptable academic activities will be considered unacceptable. Unacceptable activities include, but are not limited to, the following academic (including learning and teaching and research) activities:*

  a. **Cheating**: *is any attempt to dishonestly give or obtain assistance from another person, material, or device in an academic exercise*

  b. **Contract-cheating**: *is having another person or entity conceive, research or write material for an assignment and submitting the work as one's own, irrespective of whether the other person or entity was paid for the material.*

  c. title: 'Schedule 2: Definitions of Academic Activities' – source - https://staff.mq.edu.au/work/strategy-planning-and-governance/university-policies-and-procedures/policies/academic-integrity

**Rutgers University**

- *Principles of academic integrity require that every Rutgers University student:*
- *make sure that all work submitted as his or her own in a course or other academic activity is produced without the aid of unsanctioned materials or unsanctioned collaboration*

  a. title: 'Academic Integrity at Rutgers' – source - http://academicintegrity.rutgers.edu/academic-integrity-at-rutgers/

**Seton Hall**

- *All forms of dishonesty, whether by act or omission, including, but not limited to, cheating, plagiarism and knowingly furnishing false information to the University, are prohibited.*
- *Work submitted in courses must be the product of the efforts of the student presenting the work, and contributions of others to the finished work must be appropriately acknowledged. The presentation of another's work as one's own is a serious violation of the academic process, and it is penalized accordingly.*
    a. Title: 'Academic and Professional Integrity' – source - https://www.shu.edu/student-life/academic-professional-integrity.cfm

**University of Florida**

- ***Cheating:*** *Using any materials or resources prepared by another Student without the other Student's express Consent or without proper attribution to the other Student.*
- ***Submission of Academic Work Purchased or Obtained from an Outside Source****: A Student must not submit as their own work any academic work in any form that the Student purchased or otherwise obtained from an outside source, including but not limited to: academic materials in any form prepared by a commercial or individual vendor of academic materials; a collection of research papers, tests, or academic materials maintained by a Student Organization or other entity or person, or any other sources of academic work.*
    a. Title: 'Violations of the Student Honor Code' – source: https://sccr.dso.ufl.edu/policies/student-honor-code-student-conduct-code/

**Texas A&M University**

- ***20.1.2.3.1 Cheating:***
- *Having others conduct research or prepare work without advance authorization from the instructor.*
- *Acquiring answers for any assigned work or examination from any unauthorized source. This includes, but is not limited to, using the services of commercial term paper companies, purchasing answer sets to homework*

*from tutoring companies, and obtaining information from students who have previously taken the examination.*

- *Providing a fabricated document to any University employee in order to obtain an excused absence or to satisfy a course requirement; altering an official document such as a transcript.*
- *Other similar acts.*
    a. Title: 'Honor System Rules' subheading: '20.1.2.3 DEFINITIONS OF ACADEMIC MISCONDUCT' – source: https://aggiehonor.tamu.edu/Rules-and-Procedures/Rules/Honor-System-Rules

**Ohio State University**

- *Submission of work not performed in a course: This includes (but is not limited to) instances where a student fabricates and/or falsifies data or information for a laboratory experiment (i.e., a "dry lab") or other academic assignment. It also includes instances where a student submits data or information (such as a lab report or term paper) from one course to satisfy the requirements of another course, unless submission of such work is permitted by the instructor of the course or supervisor of the research for which the work is being submitted*
    a. Title: 'Defining Academic Misconduct – source: https://oaa.osu.edu/academic-integrity-and-misconduct

**University of Texas at Austin**

- *complete your assignments independently unless expressly authorized to seek or obtain assistance in preparing them;*
- *avoid engaging in any form of academic dishonesty on behalf of yourself or another student.*
    a. Title: 'Academic Integrity' – source: http://deanofstudents.utexas.edu/conduct/academicintegrity.php

**Yale University**

- ***C. Plagiarism***
- *Plagiarism is the use of someone else's work, words, or ideas as if they were one's own. Thus, most forms of cheating on examinations are plagiarism; but the term is usually used in reference to papers rather than examinations.*
- *Submission of an entire paper prepared by someone else is an especially egregious form of plagiarism, and is grounds for the imposition of a particularly serious penalty, including expulsion from the University.*
    a. Title: 'Academic Dishonesty' subheadings: 'Cheating on examinations', 'Plagiarism' – source: http://catalog.yale.edu/undergraduate-regulations/regulations/academic-dishonesty/

**Columbia University**

- ***Cheating:*** *Wrongfully using or attempting to use unauthorized materials, information, study aids, or the ideas or work of another in order to gain an unfair advantage, is prohibited.*
- ***Plagiarism:*** *The use of words, phrases, or ideas that do not belong to the student, without properly citing or acknowledging the source, is prohibited. This may include, but is not limited to, copying computer programs for the purposes of completing assignments for submission.*
    a. Title: 'Policies', 'Academic Violations' – source: https://studentconduct.columbia.edu/content/policies

**New York University**

- ***Plagiarism:*** *presenting others' work without adequate acknowledgement of its source, as though it were one's own. Plagiarism is a form of fraud.*
- ***Cheating:*** *deceiving a faculty member or other individual who assess student performance into believing that one's mastery of a subject or discipline is greater than it is by a range of dishonest methods, including but not limited to:*
- *submitting work (papers, homework assignments, computer programs, experimental results, artwork, etc.) that was created by another, substantially or in whole, as one's own*

a. Title: 'Academic Integrity for Students at NYU' – source: https://www.nyu.edu/about/policies-guidelines-compliance/policies-and-guidelines/academic-integrity-for-students-at-nyu.html

**Arizona State University**

- *Academic dishonesty falls into five broad areas that include but are not limited to:*
- *Cheating on an academic evaluation or assignment.*
- *Plagiarizing.*
- *Academic deceit, such as fabricating data or information.*
- *Aiding academic integrity policy violations and inappropriately collaborating.*
    a. Title: 'What is Academic Integrity?' – source: https://provost.asu.edu/academic-integrity

**University of Washington**

- ***WHAT IS ACADEMIC MISCONDUCT?***
- *You are guilty of cheating whenever you present as your own work something that you did not do. You are also guilty of cheating if you help someone else to cheat.*
    a. Title: 'What is Academic Misconduct?' – source: https://depts.washington.edu/grading/pdf/AcademicResponsibility.pdf

# APPENDIX B – SUMMARY OF SOURCES' ALLEGATIONS AS TO GENERAL PRACTICES

| Former Employee | Title | Office | Reports |
|---|---|---|---|
| **FE 2** | Early-Stage Consultant | Guangzhou | • Intake practices<br>• Ghostwriting practices<br>• Impersonation practices |
| **FE 3** | Early-Stage Consultant | Kunming | • Intake practices<br>• Ghostwriting practices<br>• Impersonation practices<br>• Training/recognition practices |
| **FE 12** | Document Specialist | Taiyuan | • Ghostwriting practices<br>• Training/recognition practices |
| **FE 13** | Document Specialist | Hefei | • Intake practices<br>• Use of templates<br>• Ghostwriting practices<br>• Training/recognition practices<br>• Impersonation practices |
| **FE 16** | Document Specialist | Hefei | • Ghostwriting practices<br>• Impersonation practices<br>• Training/recognition practices |
| **FE 18** | Document Specialist | Unspecified | • Ghostwriting practices<br>• Training/recognition practices |
| **FE 19** | Document Specialist | Wuhan | • Ghostwriting practices<br>• Use of templates<br>• Training/recognition practices |
| **FE 20** | Document Specialist | Nanjing | • Ghostwriting practices<br>• Training/recognition practices |
| **FE 21** | Document Specialist | Suzhou | • Ghostwriting practices<br>• Training/recognition practices |
| **FE 22** | Document Specialist | Hunan | • Intake practices<br>• Ghostwriting practices<br>• Training/recognition practices<br>• Student editing practices |
| **FE 23** | Document Specialist | Chongqing | • Intake practices<br>• Use of templates<br>• Ghostwriting practices |

| | | | |
|---|---|---|---|
| **FE 24** | Document Specialist | Beijing | • Intake practices<br>• Ghostwriting practices<br>• Training/recognition practices<br>• Student editing practices |
| **FE 25** | Document Specialist | Shanghai | • Ghostwriting practices<br>• Training/recognition practices |
| **FE 26** | Document Specialist | Shanghai | • Ghostwriting practices<br>• Use of templates<br>• Training/recognition practices |
| **FE 27** | Document Specialist | Nanjing | • Ghostwriting practices<br>• Training/recognition practices<br>• Student editing practices<br>• |
| *FE 1* | Document Specialist | Beijing | • Intake practices<br>• Ghostwriting practices<br>• Use of templates<br>• Training/recognition practices<br>• Student editing practices |
| *FE 4* | Document Specialist | Zhengzhou | • Intake practices<br>• Ghostwriting practices<br>• Use of templates<br>• Training/recognition practices<br>• Student editing practices<br>• Impersonation practices |
| *FE 9* | Early-Stage Consultant | Qingdao | • Training/recognition practices<br>• Ghostwriting practices<br>• Impersonation practices |
| FE 5 | Marketing Specialist | Zhengzhou | • Intake practices<br>• Training/recognition practices<br>• Ghostwriting practices<br>• Impersonation practices |
| FE 6 | Document Specialist | Zhengzhou | • Ghostwriting practices<br>• Use of templates<br>• Training/recognition practices<br>• Impersonation practices |
| FE 7 | Senior Advisor | Beijing (U.S. Department) | • Ghostwriting practices<br>• Training/recognition practices |
| FE 8 | Marketing Manager | Zhengzhou (U.S. Department) | • Intake practices<br>• Ghostwriting practices<br>• Training/recognition practices |

| | | | |
|---|---|---|---|
| FE 10 | Document Specialist | Wuhan | • Ghostwriting practices<br>• Training/recognition practices<br>• Impersonation practices |
| FE 11 | Document Specialist | Changsha | • Ghostwriting practices<br>• Use of templates<br>• Training/recognition practices |
| FE 14 | Intern | Shanghai | • Ghostwriting practices<br>• Training/recognition practices |
| FE 15 | Document Specialist | Nanchang | • Intake practices<br>• Training/recognition practices<br>• Ghostwriting practices |
| FE 17 | Document Specialist | Changsha | • Ghostwriting practices<br>• Use of templates |

**Legend:**

**Intake practices:** EDU Overseas used intake questionnaires and/or meetings to obtain information to ghostwrite.

**Ghostwriting practices:** EDU Overseas consultants ghostwrite documents

**Use of templates:** EDU Overseas relied on templates

**Student editing practices:** Many students did not even edit "their" application documents

**Training/recognition practices:** EDU Overseas trained employees to ghostwrite and rewarded them as such

**Impersonation practices:** EDU Overseas Early-Stage Specialists impersonated students with universities